ORTHOTIC & PROSTHETIC LAB, INC.,
doing business as St. Louis Prosthetic
and Orthotic, Appellant,

v.

Lambert POTT, Respondent.

No. 62130.

Missouri Court of Appeals,
Eastern District,
Division Four.

March 2, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 13, 1993.

Application to Transfer Denied
May 25, 1993.

James R. Dankenbring, Joe D. Jacobson, St. Louis, for appellant.

Mark H. Levison, Sherry L. Gunn, St. Louis, for respondent.

CRAHAN, Judge.

This is an appeal filed by Plaintiff, Orthotic and Prosthetic Lab, Inc. ("Plaintiff") from a judgment in favor of Defendant, Lambert Pott ("Defendant") denying permanent injunctive relief[1] to enforce a non-competition agreement entered into between Defendant and Plaintiff's assignor, Prosthetic and Orthotic Services, Inc. ("POSI"). The issues presented at trial and on appeal are succinctly stated in the parties' extensive and highly commendable Joint Stipulation of Fact which comprised the bulk of the record made before the trial court:

"If [Defendant's] obligations under the non-competition agreement have been discharged because of (i) POSI's withdrawal from the relevant market and the non-assignability of the non-competition agreement between [Defendant] and POSI, or (ii) by a prior, material breach of contract by POSI, then [Defendant] is no longer restricted from engaging in the Business. If, on the other hand, his obligations have not been so discharged and he is still bound by his non-competition agreement, then his present activities engaging in the Business are in violation of his non-competition agreement."

We hold that the non-competition agreement was assignable and that Defendant's obligations under that agreement were not discharged by reason of POSI's withdrawal from the market or by any prior, material breach by POSI. We therefore reverse the judgment of the trial court and remand for entry of a permanent injunction enforcing the non-competition agreement and for further proceedings consistent with this opinion.

From the parties' Joint Stipulation of Fact we learn that Defendant is a certified prosthetist who resides in St. Louis County, Missouri. Defendant has engaged in the business of constructing and fitting orthopaedic appliances (braces) and prostheses (artificial limbs) ("the Business") in the St. Louis area since 1971.

For some period prior to January, 1987, Defendant was an equal owner of a Missouri corporation, St. Louis Prosthetic & Orthotic, Ltd. ("SLP & O"), with John Klotz. At that time, SLP & O had a wholly-owned subsidiary, Southern Illinois Prosthetic & Orthotic, Ltd. ("SIPO"), an Illinois corporation operating in Troy, Illinois. In January, 1987, Defendant and Klotz executed a "Memorandum of Understanding" which purported to divide the SLP & O and SIPO business between Defendant and Klotz. Generally speaking, under the terms of the Memorandum of Understanding Defendant was to take control of SLP & O and the Missouri prosthetics business and Klotz was to take control of SIPO and the Illinois prosthetics business. The Memorandum of Understanding also stated, "all

---

1. In its petition, Plaintiff also asserted claims for money damages and attorney's fees. Those claims have not been determined by the trial court and are not before us. The trial court expressly certified its judgment denying injunctive relief as final based on its determination that there was no just reason for delay. See Rule 74.01(b).

orthotic patients shall be referred to [SIPO]." Thereafter, Defendant became the sole shareholder of SLP & O.

In December, 1988, SLP & O sold its business and assets to POSI, a Missouri corporation that was created by SSM Health Care Group, Inc. for the purpose of acquiring the SLP & O business. The terms of the sale of SLP & O to POSI were set forth in a document entitled "Asset Purchase Agreement," which consisted of 24 single spaced pages and an additional 107 pages of Exhibits and schedules which were attached to the Asset Purchase Agreement and expressly incorporated therein by reference.

The first paragraph of the Asset Purchase Agreement recites that it is an agreement made by and among SLP & O as Seller, POSI as Buyer, and Defendant as sole shareholder of Seller. POSI and defendant also entered into an Employment Agreement which was incorporated into the Asset Purchase Agreement as an Exhibit. All parties were represented by legal counsel in connection with these transactions.

The Asset Purchase Agreement provided for payments to SLP & O and to Defendant personally as follows:

2. *Purchase Price.*

2.1  In consideration of the transfer to the Buyer of the Acquired Assets as provided in Article 1 hereof and in consideration of the non-competition agreements described in Section 2.2, the Buyer hereby agrees (a) to deliver to Seller a promissory note in the principal amount of Two Hundred Eighty Thousand Dollars ($280,000.00) in the form of *Exhibit A* attached hereto (the "Note"), and (b) to pay to Pott an amount equal to One Hundred Forty Thousand Dollars ($140,000.00) (the "Cash Payment"). The Cash Payment will be payable on the Closing Date by cashier's or certified check or wire transfer. The sum of the Note, the Cash Payment and the liabilities being assumed pursuant to Section 3.1 hereof is sometimes hereinafter referred to as the "Purchase Price." The Buyer reserves the right to offset against the amount of the Note any and all amounts which may be owed by Seller to Buyer pursuant to this Agreement, including but not limited to amounts owed because of a breach of any representation or warranty contained in this Agreement.

2.2  The Purchase Price shall be allocated by the parties to the Acquired Assets and the non-competition agreements of the Seller and Pott pursuant to an appropriate closing schedule ("Closing Schedule") in accordance with the requirements of Section 1060 of the Internal Revenue Code of 1986, as amended, and consistent with the principles of *Schedule 2.2* attached hereto. The parties agree that the amount of One Hundred Thousand Dollars ($100,000.00) shall constitute consideration to Pott for the covenant described in Article IX hereof and in Section 1.4 of the Employment Agreement. The parties further agree that the amount of Forty Thousand Dollars ($40,000.00) shall constitute consideration to Pott for entering into the Employment Agreement. Said amounts shall be satisfied from the Cash Payment.

Schedule 2.2 referenced in the foregoing paragraph allocated the purchase price as follows:

| | |
|---|---|
| Non–Competition Covenant—Pott | $100,000.00 |
| Non–Competition Covenant—Seller | 50,000.00 |
| Consideration for entering into Employment Agreement—Pott | 40,000.00 |
| Payment for tangible assets (furniture, fixtures, equipment inventory, etc.) | 53,000.00 |
| Accounts Receivable | 85,000.00 |
| Goodwill | $114,166.73 |

Article IX and Section 1.4 of the Employment Agreement referenced in Paragraph 2.2 above contain substantially similar non-competition covenants. Section 1.4 of the Employment Agreement, the principal provision at issue in this case, provided:

1.4 *Non–Compete.* During the term of this Agreement and for a period of two (2) years after termination of this Agreement or the employment relationship between Prosthetic Services and Pott, whichever occurs later, Pott shall not in any manner, directly or indirectly,

on behalf of himself or on behalf of or for the benefit of any person, firm, partnership, corporation, business or organization other than Prosthetic Services, compete with Prosthetic Services, perform any services relating to orthotics or prosthetics or engage in, finance, own or operate any facility or laboratory involved in orthotics or prosthetics within a one hundred (100) mile radius of St. Louis County, Missouri or within a one hundred (100) mile radius of any other county where Prosthetic Services establishes a facility or laboratory having as its principal purpose the design, manufacture or sale of orthotic or prosthetic devices.

1.4.1 *Reasonable Restrictions.* Pott acknowledges that the restrictions set forth in this Section 1.4 are reasonable in scope and essential to Prosthetic Services' legitimate business interests and that the enforcement thereof will not in any manner preclude Pott from becoming gainfully employed in such manner and to such extent as to provide a standard of living for himself, the members of his family, and those dependent upon him of at least the sort and fashion to which he and they have become accustomed and may expect.

The stated term of the Employment Agreement was from January 1, 1989 to December 31, 1993, unless otherwise renewed as provided in the Agreement. The parties have stipulated that the non-competition agreement Defendant executed in connection with his sale of the SLP & O business to POSI is reasonable in all regards, including geographic scope and duration. It is Defendant's contention that he was discharged from his obligation to comply with the non-competition agreement by certain events that took place after the date on which he entered into the agreement.

### Defendant's Employment With POSI; Klotz Litigation

Pursuant to his Employment Agreement with POSI, Defendant began working for POSI as facility director in January, 1989.

Defendant's work for POSI included orthotics. Shortly thereafter, in February, 1989, Defendant's former co-owner Klotz and SIPO filed suit against Defendant, SLP & O and POSI to enforce the restrictions in the Memorandum of Understanding entered into between Defendant and Klotz which allegedly prohibited Defendant from engaging in orthotics and from engaging in prosthetics work for clients in Southern Illinois.[2]

After Klotz and SIPO filed suit, POSI notified Defendant in writing that it was claiming indemnification under the Asset Purchase Agreement. POSI pointed out that a provision of the Asset Purchase Agreement required disclosure of "all of the material contracts currently in effect relating to the Business to which the seller is a party ..." on a specified schedule to the Asset Purchase Agreement. The Memorandum of Understanding was not listed on that schedule. In light of Defendant's/SLP & O's failure to disclose the Memorandum of Understanding, POSI relied on Schedule 14.1 to the Asset Purchase Agreement requiring that Defendant and SLP & O indemnify, defend and hold POSI harmless for any losses, liabilities or consequential damages arising out of any inaccuracy and/or any breach of their representations in the Asset Purchase Agreement.

In December, 1989, POSI sent SLP & O the final payment due on the promissory note as required by the terms of the note and the Asset Purchase Agreement but deducted from the payment due the sum of $31,914.39, which POSI claimed to represent attorney's fees incurred in defense of the Klotz/SIPO lawsuit. POSI claimed the right to offset such attorney's fees against the amount owed SLP & O based on language in the Agreement and note expressly authorizing such offsets. Specifically, the Asset Purchase Agreement provided in relevant part:

> "The Buyer reserves the right to offset against the amount of the Note any and all amounts which may be owed by Seller

**2.** Klotz's injunction action against Defendant, SLP & O and POSI was dismissed and refiled as a petition for damages against the same defendants in August, 1989.

to Buyer pursuant to this Agreement, including but not limited to amounts owed because of a breach of any representation or warranty contained in this Agreement."

POSI's Promissory Note to SLP & O also provided in relevant part:

"The Maker shall have the right to offset the payments of principal due to the Payee hereunder against any amounts due and owing from the Payee to the Maker. In the event Maker invokes its offset rights, Payee shall not have the right to declare this Note to be in default for any failure by Maker to make any payments due under this Note until Maker's offset rights are consumed."

On March 20, 1990, Defendant's attorney responded to POSI asserting that POSI had no right to withhold full payment of the final installment of the note, contending that: (a) the Memorandum of Understanding was not a "material contract" as defined in the Asset Purchase Agreement; (b) the existence of the Memorandum of Understanding was disclosed to POSI prior to the closing; and (c) the amount of attorney's fees withheld were unreasonable. In subsequent correspondence, POSI disputed each of these contentions and reiterated its position that it was authorized under the terms of both the Asset Purchase Agreement and the promissory note to withhold amounts paid to its attorneys to defend the Klotz suits. Although the Asset Purchase Agreement provided for mandatory, binding arbitration of all disputes arising out of the Agreement, except disputes relating to the non-competition covenants, neither Defendant nor SLP & O had demanded such arbitration as of the date of trial.

On May 21, 1991, Defendant, through his attorneys, offered to assume on POSI's behalf the defense of the second Klotz suit and to indemnify POSI for any resulting judgment that might fall within the ambit of the indemnity provisions of the Asset Purchase Agreement. Thereafter, POSI's counsel withdrew from the second Klotz suit and Defendant's attorneys entered their appearance for POSI.

Defendant continued to work for POSI until September, 1991, at which time he voluntarily left POSI's employ to accept a position at Lake Medical Products, which had not, historically, been involved in the orthotics and prosthetics business.

### POSI's Sale Of Its Business To Plaintiff

On December 20, 1991, Plaintiff entered into an agreement with POSI whereby Plaintiff acquired the POSI business and most of its assets for the sum of $200,000. Plaintiff's Asset Purchase Agreement with POSI specified that Plaintiff was acquiring all of POSI's customer lists, supplier lists and the fictitious name "St. Louis Prosthetic and Orthotic," together with the goodwill of POSI's business represented thereby. In addition, Plaintiff expressly acquired POSI's rights under the non-competition covenants contained in POSI's Employment Agreement with Defendant. These rights were described in Plaintiff's Agreement with POSI as follows:

"Rights under Sections 1.4, 1.5 and 1.6 of Employment Agreement For Facility Director ("Restrictive Covenant") between [POSI] and [Defendant] dated December 31, 1988 on a participatory basis with [POSI]."

Following POSI's sale of its Business to Plaintiff, POSI ceased engaging in the Business. In late March or early April, 1992, Defendant began directly and openly competing with Plaintiff, resulting in this suit for injunctive relief and damages. After considering the parties's extensive Joint Stipulation of Fact and stipulated exhibits, followed by a brief hearing at which Plaintiff's President and Defendant both testified, the trial court denied preliminary and permanent injunctive relief.

### Standard of Review

The standard of review in court-tried cases is well established. We must defer to the trial court and affirm the judgment unless there is no substantial evidence to support it or it is against the weight of the evidence, or unless the trial court erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32

(Mo. banc 1976). Where, as here, the trial court makes no findings of fact, we will consider all factual issues to have been found in accordance with the result reached and will sustain the judgment if the result is correct on any tenable basis. *Brown v. Mercantile Bank of Poplar Bluff,* 820 S.W.2d 327, 334 (Mo.App.1991). However, where facts are largely stipulated, it is error for a trial court to find a fact contrary to the parties' stipulation. *Degerinis v. Degerinis,* 724 S.W.2d 717, 720 (Mo.App. 1987).

In this case, the parties stipulated that there were three possible findings which would, if supported by the evidence, support a judgment for Defendant. These possible findings are (1) a determination that Defendant's covenant was not assignable; (2) a determination that Defendant's covenant was discharged by POSI's withdrawal from the market; and (3) a determination that Defendant was relieved of his obligation by reason of prior material breaches of the Agreement by POSI. We will address each of these possible findings in turn.

### *Assignability Of Defendant's Covenant Not To Compete*

■ Plaintiff maintains that the trial court could not properly have found that Defendant's non-competition covenant was not assignable because (1) the covenant is assignable under the express terms of the contract between the parties; and (2) even if it is not expressly assignable, a non-competition agreement made in connection with the sale of a business is not a personal services contract and is therefore fully assignable in a subsequent sale of the business unless the agreement expressly provides otherwise. We find that the non-competition covenant is assignable under the express terms of the contract between Defendant and POSI and therefore need not address the second contention.

As indicated above, the non-competition covenants at issue are set forth in paragraphs 1.4, 1.5, and 1.6 of the Employment Agreement entered into between Defendant and POSI concurrently with the closing of the Asset Purchase Agreement transferring the assets of SLP & O to POSI. Although the Employment Agreement itself is silent with regards to POSI's authority to assign its rights under the Employment Agreement, the Employment Agreement is expressly incorporated into and made apart of the Asset Purchase Agreement, which does address assignability. Specifically, Paragraph 15.7 of the Asset Purchase Agreement provides:

> 15.7 *Binding Effect.* This Agreement shall be binding on and inure to the benefit of the parties and their respective heirs, successors, assigns and legal representatives.

This court has previously held virtually identical language sufficient to render a non-competition covenant assignable. *Schnucks Twenty–Five, Inc. v. Bettendorf,* 595 S.W.2d 279, 287 (Mo.App.1979).

Defendant advances several arguments to counter this conclusion. First, Defendant points out that the Employment Agreement itself does address assignability in that it expressly forbids Defendant from assigning his rights or responsibilities under the Employment Agreement. From this fact, Defendant urges that the Employment Agreement's silence with respect to POSI's ability to assign its rights cannot be treated as conferring assignment rights on POSI because the subject is specifically covered by the express terms of the contract.

The problem with this argument is that it assumes that the Employment Agreement is a separate, integrated agreement instead of one part of a larger integrated agreement of which the Employment Agreement is simply one component part. As discussed above, Defendant's assumption is contrary to the express terms of the Asset Purchase Agreement, which incorporates the terms of the Employment Agreement as if fully set forth therein. Moreover, it is manifest from even a cursory examination of the Asset Purchase Agreement that the Employment Agreement is not a "stand alone" document. For example, as discussed previously, the consideration ($100,-000 cash) for the non-competition covenants

contained in the Employment Agreement is set forth in the Asset Purchase Agreement, not in the Employment Agreement. Given the integrated structure of the Asset Purchase Agreement, the reason that the Employment Agreement addresses Defendant's authority to assign his obligations and not POSI's is clear; the prohibition against Defendant's assignment of his obligations is an exception to the general authority to assign set forth in the Asset Purchase Agreement of which the Employment Agreement is merely a component part.

◼ Next, Defendant contends that he is not bound by the assignment provisions of the Asset Purchase Agreement because he did not sign that Agreement in his individual capacity. In support of this contention, Pott points to the fact that the Asset Purchase Agreement contains only two signature lines, one for POSI as buyer and one for St. Louis Prosthetic and Orthotic, Ltd. Defendant's signature thus appears only once, under St. Louis Prosthetic and Orthotic, Ltd. "Although it is generally true that an agent who discloses the name of his principal to the persons with whom he is dealing incurs no personal responsibility on account of the transaction, there is an exception where the contract or circumstances of the transaction discloses a mutual intention to impose a personal responsibility on the agent." *Kalberg v. Gilpin Company*, 279 S.W.2d 177, 181 (Mo.App. 1955). Assuming for purposes of argument that Defendant's signature is indicative of a representative capacity only and not joint representative and individual capacities,[3] we do not believe that the Asset Purchase Agreement is reasonably susceptible of a construction that it was not mutually intended to be binding on Defendant in his individual capacity as well. As discussed earlier, the preamble to the Asset Purchase Agreement expressly states that both SLP & O and Defendant are parties. It provides for certain payments to be made to SLP & O and others to be made to Defendant individually in exchange for cov-

enants and warranties that can only be satisfied by Defendant. It contains numerous representations, warranties and indemnities which are purportedly given by both SLP & O and Defendant. As a condition of the closing, Defendant was required to provide an opinion letter that certified, inter alia, that the "Acquisition Agreements have been duly authorized, executed and delivered by [SLP & O] and [Defendant] and constitute legal, valid and binding obligations of [SLP & O] and [Defendant]...." We find that Defendant was a party to the Asset Purchase Agreement in his individual capacity.

◼ Next, Defendant urges that the Employment Agreement must have been entered into after the Asset Purchase Agreement because it was required by the Asset Purchase Agreement. So reasoning, Defendant maintains that the integration clause of the Employment Agreement precludes assertion of rights under the Asset Purchase Agreement because it is a "prior writing" and therefore superseded. This argument ignores the fact that the Employment Agreement is part of and incorporated into the Asset Purchase Agreement. Further, although we doubt the relevance under the circumstances, there is no substantial evidence in this record that the Agreements were not executed contemporaneously.

Finally, Defendant argues that the Asset Purchase Agreement cannot be considered because the Asset Purchase Agreement is inadmissible in that Plaintiff did not plead that it was assigned any rights under that Agreement. The short answer to this contention is that the existence and terms of the Asset Purchase Agreement were stipulated by the parties and the Agreement itself was offered as a joint exhibit. In any event, Plaintiff did not need to plead that it was assigned rights under the Asset Purchase Agreement. The rights Plaintiff was assigned were set forth in the Employment Agreement. The Asset Purchase Agree-

---

**3.** The signature is, at best, ambiguous with regard to whether Defendant signed in his individual capacity. It does not indicate any title under Defendant's name but does indicate a title of Vice President under the signature of POSI's representative.

ment simply provides the source of POSI's authority to assign those rights to Plaintiff. The Asset Purchase Agreement was properly admissible to prove POSI's authority once it was placed in issue by Defendant.

### Significance of POSI's Withdrawal From The Market

Coincident with POSI's sale of the bulk of its assets to Plaintiff, and as required by the Agreement between POSI and Plaintiff, POSI withdrew from the orthotics and prosthetics market in St. Louis on December 20, 1991. Plaintiff maintains that POSI's withdrawal from the market is irrelevant to Defendant's obligations because, in addition to barring competition with POSI, Defendant's covenant not to compete expressly prohibits Defendant from practicing prosthetics and orthotics within 100 miles of St. Louis County, without regard to POSI's activities. Further, according to Plaintiff, such obligation continues for a period of two years from termination of the Employment Agreement or termination of employment, whichever is *later*. The Employment Agreement grants POSI, but not Defendant, the right to terminate the Employment Agreement for various specified reasons, including POSI's withdrawal from the business. Plaintiff claims that POSI did not exercise such right and that the Employment Agreement therefore remains in effect. Inasmuch as the stated term of the Employment Agreement was from January 1, 1989 to December 31, 1993, Plaintiff reasons that Defendant's obligations under the non-competition covenants continue for two years after expiration of the stated term of the Employment Agreement, or until December 31, 1995.

Defendant answers this contention by emphasizing the numerous references in the covenant to competition with POSI and essentially urges that the covenant must be construed as only barring competition with POSI. Inasmuch as POSI is no longer engaged in the prosthetics or orthotics business, Defendant reasons that POSI's withdrawal from the market relieves him from any further obligations under the cov-

enant. Alternatively, Defendant urges that his voluntary termination of employment in September, 1991 effectively terminated the Employment Agreement so that his two year obligation under the non-competition covenant expires in September, 1993, not December, 1995 as urged by Plaintiff.

Neither of these positions can be sustained under the language of the Agreements at issue. The non-competition covenants at issue have two basic components for which Defendant accepted separate and substantial consideration: (1) an "exclusive employment" component, for which Defendant was paid $40,000 cash at closing; and (2) a "non-competition" component, for which Defendant was paid $100,000 cash at closing. The justification for and purpose of such separate components is apparent upon a brief examination of the evidence with respect to Defendant's influence in the market and the nature of the prosthetics and orthotics business.

As Defendant and POSI agreed in Section 9.1 of the Asset Purchase Agreement, Defendant is one of a limited number of persons who developed the business of constructing and fitting orthopaedic appliances and prostheses. Plaintiff's president Mr. Weber testified at the hearing that the nature of the business is such that patients develop their relationships with individual practitioners of prosthetics and orthotics. Patients may, in fact, be completely unaware of the company that employs such practitioners. A company purchasing customer lists and patient records from another company is seeking to capitalize on the patient relationships that existed with the seller and to establish relationships with additional physicians and physical therapists the purchaser may not have done business with in the past. As Weber put it, "the business is the relationships that exist." An enforceable non-competition covenant with the provider that initially developed such relationships is therefore of utmost importance to one purchasing patient records, customer lists and goodwill because if a skilled provider such as Defendant is still available in the marketplace

and able to accept referrals, the company purchasing the patient records will not get the business.

In light of the foregoing circumstances, the purpose of each of the components of the covenants POSI obtained from Defendant is clear. Aside from its purchase of SLP & O's customer lists and goodwill, POSI sought to transfer customer allegiances and goodwill from SLP & O to POSI by obtaining the exclusive rights to Defendant's services in the area of orthotics and prosthetics for a minimum of four years, followed by two years of operation free from competition by Defendant in which to solidify such relationships (if the Employment Agreement was not extended by mutual consent). For that exclusive right to Defendant's services, POSI paid Defendant $40,000 in cash at the closing of the sale, which was separate from and in addition to the compensation Defendant was to be paid for services he actually performed as POSI's employee.

The four year term of the Employment Agreement offered at least some protection to POSI in the event Defendant decided to leave earlier. Because POSI could not enforce Defendant's obligations through an action for specific performance, it would at least have the assurance that it would not face competition from Defendant for the balance of the four year period plus the two year non-competition period. Thus, if Defendant failed to live up to his obligations under the Employment Agreement, POSI would enjoy a lengthier period in which to solidify relationships with patients and referring physicians before it had to compete head-to-head with Defendant.

So understood, it is apparent why the Employment Agreement makes no provision for unilateral termination of the Agreement by Defendant and why we must reject Defendant's contention that his voluntary departure from POSI in September, 1991 had the effect of terminating the Employment Agreement. If Defendant could unilaterally terminate the Employment Agreement any time he pleased, then POSI paid him $40,000 for nothing. He could have just as easily walked away from POSI

after a few days, kept the $40,000 paid to him for signing the Agreement along with the $100,000 paid to him for the non-competition covenant, and reentered the business as a competitor just two years later. We do not believe that this is a sensible construction of the Agreement.

■ On the other hand, the construction urged by Plaintiff is similarly flawed. Although we agree with Plaintiff that the plain language and clear intent of the Employment Agreement contemplate that POSI would enjoy a minimum of six years free from competition by Defendant, we cannot agree that the parties intended that Defendant would be barred from the market for this entire period even if POSI elected to withdraw from the market completely and had no use for Defendant's services. By withdrawing from the market, POSI rendered it impossible for Defendant to render the services called for in the Employment Agreement. Although it is true that Defendant voluntarily left POSI's employ prior to POSI's withdrawal from the business, the Agreement cannot reasonably be construed to permit POSI to claim the exclusive right to Defendant's services after it has, by its own actions, rendered it impossible for Defendant to perform the services agreed upon. Rather, we conclude that POSI's withdrawal from the market was expected and intended to terminate the Employment Agreement. Inasmuch as the two-year non-competition covenants take effect upon termination of employment or termination of the Agreement, whichever is *later*, Defendant's obligations under the non-competition covenants do not expire until December 20, 1993, which is two years from POSI's withdrawal from the business.

■ As for Defendant's contention that the non-competition covenants only bar competition with POSI, we need look no further than the language of the covenant set forth *supra*. Specifically, aside from prohibiting competition with POSI, the covenant clearly and unambiguously provides that Defendant will not "perform any services relating to orthotics or prosthetics or engage in, finance, own or operate any

facility or laboratory involved in orthotics or prosthetics within a one hundred (100) mile radius of St. Louis County, Missouri...." By its express terms, the covenant is not strictly personal to POSI. Further, where such a covenant is given in connection with the sale of business accounts, customer lists and goodwill [4] which, as we have determined, are fully assignable to others, it may properly be viewed as incident to the property conveyed. *See Schnucks Twenty–Five, supra,* 595 S.W.2d at 287. Given the nature of the business as described by Plaintiff's president Mr. Weber, the value of the goodwill associated with customer lists and account records conveyed by Defendant to POSI and subsequently by POSI to Plaintiff would be virtually nil without Defendant's covenant, for which he accepted a substantial cash payment at closing. Defendant has stipulated that the covenant is reasonable as to geographic scope and duration. We can discern no basis for relieving him from the express terms of his bargain.[5]

### Alleged Prior Material Breaches By POSI

As an affirmative defense to Plaintiff's action to enforce his non-competition covenant, Defendant asserts that he has been relieved of his obligation to abide by the covenant by reason of POSI's prior material breaches of contract. Specifically, Defendant posits three separate breaches by POSI: (1) POSI's withholding of attorney's fees incurred in the Klotz litigation from the final payment due on the note; (2) POSI's double counting of such fees, later corrected, by reimbursing SSM Health Care after deducting the same fees from amounts due Defendant; and (3) POSI's alleged payment of a "finder's" or "broker's" fee contrary to the terms of the contract.

Defendant does not dispute the fact that both the Promissory Note and the Asset Purchase Agreement give POSI the right to withhold or offset amounts owed by reason of a breach of representations or warranties contained in the Asset Purchase Agreement. Rather, Defendant maintains that POSI's withholding of fees incurred in connection with the Klotz litigation was a material breach of contract [6] because (a) the Memorandum of Understanding was not a "material contract" SLP & O and Defendant were required to disclose by the terms of the Asset Purchase Agreement; (b) the existence of the Memorandum of Understanding was disclosed to POSI prior to closing; and (c) the amount of attorney's fees withheld by POSI were unreasonable. None of these contentions are supported by the record.

■ The Memorandum of Understanding between Defendant and Klotz was introduced as a joint exhibit. Insofar as it purports to divide the business as it then existed and to allocate all Illinois accounts and all orthotics referrals to Klotz, it is

**4.** Missouri courts have long recognized a distinction between covenants ancillary to a sale of a business and covenants merely ancillary to an employment contract, showing substantially greater liberality in enforcing the former. *See* Hinderer, *Covenants Not To Compete,* 41 Mo. L.Rev. 37, 44 (1976).

**5.** In his brief, Defendant offers the additional argument that the phrase "on a participatory basis with Seller" appearing in the description of the rights conveyed from POSI to Plaintiff somehow increases the restrictions on Defendant and thereby relieves him of any further obligation under his covenant. This ground was not set forth in the parties' stipulation of the issues presented to the trial court and for that reason, we decline to consider it here. We note, however, that Defendant's argument is unpersuasive in view of POSI's own covenant not to compete with Plaintiff. In light of that covenant it is difficult to see how POSI could obtain either legal or equitable relief against Defendant so as to increase the restrictions set forth in the covenant as Defendant urges.

**6.** *Which* contract is not specified. Although it does not affect our disposition of this point, we note that Defendant's claim of breach in this instance is fundamentally inconsistent with his position, discussed *supra,* that the Asset Purchase Agreement did not bind him individually. POSI's obligations on the promissory note arise solely from the Asset Purchase Agreement. Payments on the note are to be made to SLP & O, not Defendant. How POSI's alleged breach of an agreement to which Defendant claims not to be a party can relieve Defendant of his obligations under an allegedly separate agreement is not explained.

plainly a material contract within the meaning of the Asset Purchase Agreement, regardless of whether the accounts and referrals allocated pertained to a division of then existing customers or to future customers. Defendant's sole "evidence" to the contrary consisted of Defendant's unsupported claim that the Memorandum of Understanding was not a "contract" and self serving letters from Defendant's attorney which likewise provided no basis to support this contention.

Contrary to Defendant's second contention, Defendant never unequivocally stated that the existence of the Memorandum of Understanding was disclosed *prior to closing.* More importantly, Defendant did not state that his disclosure, when it occurred, was made in a manner which would put POSI on notice that Defendant's obligations under the Memorandum were *material.* By specifying certain agreements as material and omitting the Memorandum of Understanding, Defendant and SLP & O warranted that the agreements listed were the only ones that were material. In the absence of far more specific evidence with respect to the nature and timing of the alleged verbal disclosure of the Memorandum of Understanding, Defendant has failed to satisfy his burden of establishing that he and SLP & O were not in breach of their warranties or that POSI was in breach for withholding amounts attributable to that breach. In sum, the evidence does not support a finding that POSI's withholding of legal fees incurred in the Klotz litigation from the amount due under the note was a breach of the Asset Purchase Agreement, let alone a material breach.

■ Defendant maintains nonetheless that the evidence supports a finding that the *amount* of fees withheld by POSI were unreasonable, thus constituting a material breach by POSI relieving him of his obligations under the non-competition covenant. The record does not support such a finding. The only evidence on this issue consisted of Defendant's testimony that the fees incurred by POSI were approximately ten times what he had incurred to defend against Klotz's injunction suit and a posttrial analysis of POSI's legal bills, which were identified but never offered in evidence at the hearing, suggesting that approximately 16% of the amount withheld by POSI was attributable to fees unrelated to the Klotz litigation.

Defendant's testimony on this issue is entitled to little, if any, weight. Defendant is not an expert on the subject of attorney's fees and his comparison of POSI's fees to his own is, on its face, a comparison of apples and oranges. The amounts withheld by POSI were for fees incurred through October, 1989, at least two months *after* Klotz refiled his suit as an action for damages. The fees cited by Defendant for purposes of comparison were for his attorney's services at an earlier stage of the case—*i.e.,* resisting the petition for a restraining order and injunctive relief. As for Defendant's analysis of POSI's legal bills set forth in its brief, we note that neither the trial court nor this court is the proper forum for seeking a determination of the reasonableness of the fees incurred by POSI and offset against the final payment to SLP & O. The parties agreed to binding arbitration for that purpose. In view of our determination that POSI had a right to withhold attorney's fees attributable to Defendant's breach and the availability under the contract of a means for resolving disputes over the amount thereof, Defendant's contention that the amount of fees withheld was unreasonable provides no basis for a finding that POSI's actions constituted a material breach so as to relieve Defendant of his obligations under the covenant. We therefore rule this point against Defendant.

The next alleged breach relates to an accounting error by SSM Health Care and POSI which Defendant admits was corrected long before he terminated his employment. Essentially, after POSI withheld its attorney's fees from the final payment on the note, SSM Health Care, POSI's parent, charged POSI for SSM's actual payment of the legal fees. The effect of this charge was to reduce POSI's earnings. Because Defendant was compensated for his work as POSI's facility director based in part on

a percentage of POSI's earnings, Defendant was, in effect, being charged a second time for the same expense. When Defendant learned of the erroneous charge to POSI's earnings, he protested the payment by POSI to SSM Health Care. POSI subsequently admitted the mistake and obtained a refund from SSM Health Care.

Defendant admitted at trial that the matter had been corrected but nonetheless urges on appeal that the erroneous reduction of POSI's earnings, even though subsequently corrected, demonstrated bad faith and constituted a material breach so as to relieve him of any further obligation to abide by his covenant. We disagree. By any standard, POSI's alleged breach in this instance was technical, temporary, and, in the context of the amounts involved and conceivable prejudice to Defendant, immaterial. As a matter of law, the evidence adduced on this issue was insufficient to excuse Defendant's performance of his covenant.

■■■ The final breach alleged by Defendant is POSI's alleged charging of a "finder's" or "broker's" fee, contrary to the terms of the Asset Purchase Agreement. The Asset Purchase Agreement provided in relevant part:

7.4 *Indemnification of Brokerage—Buyer.* The Buyer represents and warrants to the Seller and Pott that no broker, finder, agent or similar intermediary has acted on behalf of the Buyer in connection with this Agreement and that there are no brokerage commissions, finders' fees or similar fees or commissions payable in connection therewith based on any agreement, arrangement or understanding with the Buyer, or any action taken by the Buyer. The Buyer agrees to indemnify and save the Seller and Pott harmless from any claim or demand for commission or other compensation by any broker, finder, agent or similar intermediary claiming to have been employed by or on behalf of the Buyer and to bear the cost of legal expenses incurred in defending against any such claim.

At trial, Defendant identified and discussed $28,000 in bills, allegedly paid by POSI's affiliate and charged to POSI, which Defendant characterized as "finder's fees." In his brief, Defendant more accurately describes the services reflected on such bills as legal and financial services associated with POSI's acquisition of SLP & O. Specifically, the bills reflect such services as preparation of a business plan for the acquisition of an orthotics and prosthetics business and due-diligence investigations of POSI's proposed acquisition of SLP & O. None of the invoices references or reflects a broker's commission or finder's fee of any kind. Contrary to Defendant's contention, his lay characterization of such fees as "finder's fees" is not substantial evidence that binds Plaintiff or this court as to the true nature of the services performed, particularly in the face of the detailed descriptions of the services appearing on the invoices themselves. Defendant professed no personal knowledge of the nature of the services performed beyond the descriptions appearing on the invoices and such descriptions do not in any way support Defendant's characterization of the fees paid as finder's fees or brokerage commissions. Rather, the invoices reflect typical hourly charges for standard accounting, legal and consulting services that are not, under the evidence presented, in any way contingent upon locating a suitable business for acquisition or completion of such an acquisition. Thus, evidence does not support a determination that POSI materially breached the agreement by charging a broker's or finder's fee so as to relieve Defendant of his obligations under his covenant.

### Miscellaneous Issues

In his brief, Defendant also seeks to justify the ruling below on the basis of a balancing of the equities and advances various contentions with regard to his liability for Plaintiff's attorney's fees in the event that the judgment is reversed. We need not reach or decide either of these matters. The alleged inequities urged by Defendant on appeal are predicated for the most part on issues resolved adversely to Defendant

herein and, in any event, fall outside the dispositive issues as stipulated by the parties. Defendant stipulated that, if not otherwise excused on the grounds rejected herein, his conduct is in violation of his non-competition covenant and the scope and duration of that covenant are reasonable. There is no inequity in holding Defendant to his bargain and to his stipulation. Indeed, to consider issues beyond those stipulated by the parties before the trial court would itself be inequitable.

Defendant's liability for attorney's fees and damages has not been adjudicated by the trial court in view of its disposition and therefore cannot properly be considered in this appeal.

*Conclusion*

For the foregoing reasons, we hold that the judgment of the trial court denying permanent injunctive relief is not supported by substantial evidence and is erroneous as a matter of law. The judgment is therefore reversed and the cause is remanded to the trial court for entry of a permanent injunction prohibiting Defendant from performing any services relating to orthotics or prosthetics or engaging in, financing, owning or operating any facility or laboratory involved in prosthetics or orthotics within a 100 mile radius of St. Louis County, Missouri prior to December 20, 1993, and for further proceedings consistent with this opinion.

CARL R. GAERTNER, P.J., and CRANE, J., concur.