847 So.2d 406 (2003)
CORPORATE EXPRESS OFFICE PRODUCTS, INC., Petitioner,
v.
Doug PHILLIPS, et al., Respondents.
No. SC01-2741.
Supreme Court of Florida.
April 17, 2003.
*407 Allan H. Weitzman and Sarah A. Mindes of Proskauer Rose LLP, Boca Raton, FL, for Petitioner.
Keith F. White and Kimberly Doud of Broad and Cassel, Orlando, FL, for Respondents.
PARIENTE, J.
We have for review Phillips v. Corporate Express Office Products, Inc., 800 So.2d 618 (Fla. 5th DCA 2001), which expressly and directly conflicts with Sears Termite & Pest Control, Inc. v. Arnold, 745 So.2d 485 (Fla. 1st DCA 1999). We have jurisdiction. See art. V, § 3(b)(3), Fla. Const.

FACTS
This case involves the enforceability of noncompete agreements against former employees. Corporate Express Office Products, Inc. (Corporate Express) sought to enforce noncompete agreements against respondents Edward Goff, Doug Phillips, and Lori Farrell. The former employees raised as a defense that the noncompete agreements had been entered into with prior employers and not with Corporate Express. Because one corporate acquisition by Corporate Express was initially accomplished through a 100 percent stock purchase, as occurred in the conflict case of Sears Termite, and the other corporate acquisition occurred through a sale of assets, we explain the facts of each acquisition separately.
The first factual scenario involved employees Phillips and Farrell. In 1986, Phillips signed a noncompete agreement with his employer, Bishop Office Furniture Company (Bishop). In 1989, Farrell signed a noncompete agreement with Bishop. Neither agreement included an assignment clause. In 1997, Corporate Express of the South, Inc. (CES) purchased 100 percent of Bishop's stock. The stock purchase agreement between Bishop and CES listed the noncompete agreements with Phillips and Farrell. CES operated the business under the Bishop name until 1998, when Bishop was merged into CES. Shortly thereafter, CES merged into Corporate Express of the East, Inc. (CEE). CEE then changed its name to Corporate Express Office Products, Inc.
*408 The second scenario began in 1986 when Goff signed a noncompete agreement with his employer, Ciera Office Products (Ciera). In 1996, Ciera sold its assets, including the noncompete agreement with Goff, to CES. Goff executed a consent to Ciera's assignment of his noncompete agreement to CES. Goff did not execute any additional consents to assignment after CES merged with CEE and then changed its name to Corporate Express.
Like Bishop and Ciera, Corporate Express is engaged in the business of selling office furniture and business equipment. Phillips, Farrell, and Goff remained continuously employed with CES from the time of the corporate acquisition through the merger into CEE and the renaming of CEE as Corporate Express. In 2000, the employees terminated their employment with Corporate Express and joined a different employer, allegedly in violation of their noncompete agreements.
The terms of the noncompete agreements precluded the employees from competing against their employers or soliciting the employers' customers for one year following the termination of employment. Further, the agreements covered seven Florida counties, which were the territories serviced by respondents. Corporate Express sued Goff, Phillips, and Farrell and their new employer for unlawful use of trade secrets and breach of the noncompete agreements. Corporate Express sought a preliminary injunction to enforce the agreements.
The former employees asserted that because the noncompete agreements did not contain a clause authorizing assignment and were in fact never assigned to Corporate Express, the noncompete agreements could not be enforced. The former employees also argued that the agreements were unreasonable as to duration and geographic scope. The trial court found it "undisputed that the series of changes that Bishop and Ciera underwent before ultimately becoming known as Corporate Express were mergers, not dissolutions." The court relied on Sears Termite, which held that because a 100 percent stock purchase does not involve the dissolution of the corporate entity, a noncompete agreement is enforceable by the purchasing corporation without an assignment. Based on Sears Termite, as well as Goff's consent to the assignment of his agreement to CES and a finding that the time and area restrictions in the agreements were reasonable, the trial court granted the preliminary injunction that provided in pertinent part:
Defendants ... are enjoined from engaging in conduct that is in violation of the noncompete agreements that Phillips, Goff, and Farrell entered into as set forth in part herein, and that is in violation of Florida statutory and common law until further order of this Court.
On appeal, Phillips, Farrell, and Goff asserted that Corporate Express had no legal right to enforce the noncompete agreements because Corporate Express was not their employer when the agreements were made. See Corporate Express, 800 So.2d at 618. The Fifth District agreed, holding that the former employees' noncompete agreements with Ciera and Bishop did not bind them to Corporate Express as the successor to their original employers. See id. at 620. Acknowledging the trial court's reliance on Sears Termite, the Fifth District rejected its reasoning by explaining:
We understand how the trial court could be led astray by Sears Termite. We simply do not agree with the rationale of that case. The fact that after the change in ownership or stock sale or name change, liabilities or property rights are not changed, is irrelevant to *409 the issue in this case. Equally irrelevant to our analysis is the fact that one corporation is dissolved and a new entity created.
We focus instead on the reality that Goff, Phillips and Farrell worked for Ciera and Bishop Office Furniture Co. Those companies had a culture and mode of operation unique to themselves. Corporate Express had a culture and mode of operation different from Bishop or Ciera. Both Phillips and Farrell signed non-compete agreements with Bishop, in which Bishop is referred to as "the Employer." Goff's non-compete agreement refers to his employer as "Ciera Office Products, Inc." or "the Employer." There is no language in any of the agreements indicating that the employee is agreeing to be bound to the employers' successors or assigns. Thus, because Corporate Express did not contract with any of the former employees for new non-compete agreements, it cannot be considered "the Employer" that is identified in the agreements and the authorizing statute.
Corporate Express, 800 So.2d at 620 (emphasis supplied).[1]

DISCUSSION
The 1986 noncompete agreements between Goff and Ciera, and Phillips and Bishop, and the 1989 noncompete agreement between Farrell and Bishop, are governed by section 542.33, Florida Statutes (1985), which states in pertinent part:
(2)(a) ... [O]ne who is employed as an agent or employee may agree with his employer[ ] to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a reasonably limited time and area, ... so long as such employer continues to carry on a like business therein. Said agreements may, in the discretion of a court of competent jurisdiction, be enforced by injunction.
This statutory provision applies to noncompete agreements entered into before July 1, 1996, at which time section 542.33 was replaced by section 542.335, Florida Statutes (Supp.1996). See Ch. 96-257, §§ 1-2, at 983-87, Laws of Fla.[2] Section 542.331, Florida Statutes (2002), specifically provides that the repeal of section 542.33 does not affect restrictive covenants entered into before July 1, 1996.
The question in this case is whether the nature of the business transaction affects whether a consent to an assignment of a noncompete agreement is necessary either in the original agreement or in connection *410 with the subsequent transactions.[3] The types of transactions relevant to this case are an asset sale, a 100 percent stock sale, a merger, and a name change.
The Fifth District held that regardless of the nature of the business transactions involved, Corporate Express could not enforce the noncompete agreements without a consent by the employees to assignment. See Corporate Express, 800 So.2d at 620-21. In contrast, the First District in Sears Termite held that a consent to an assignment of the noncompete agreement was not required in a 100 percent stock purchase by one corporation of another because the stock purchase did not result in a dissolution of the corporate entity. See 745 So.2d at 486.
In addressing this conflict, we begin by reviewing Schweiger v. Hoch, 223 So.2d 557 (Fla. 4th DCA 1969), the case relied on by the Fifth District. Schweiger involved a noncompete agreement that had been entered into with a partnership. The subsequent withdrawal of a partner caused the dissolution of the original partnership and the creation of a new partnership. See id. at 558. Under those factual circumstances, the Fourth District held:
When the initial partnership was dissolved and the new one created, the defendant's continued employment could not in itself be construed as sufficient knowledge and consent to conclude that the parties intended the original contract to be assigned or that the assignment was consented to or ratified by the defendant.
The contract not to compete was for the benefit of the employing firm and when the firm changed it was incumbent upon the new firm to then have a new contract not to compete entered into. Naturally it would be the responsibility of the employee to then sign the contract or the employer could release him. It would not be the duty of the employee, when the firm was changed, to approach the employer and repudiate the contract which he had with the original employer.
Id. at 559. This reasoning is consistent with the law of partnerships that recognizes that the withdrawal of a partner dissolves the partnership as a matter of law and a new partnership is formed. See § 620.8801(1), Fla. Stat. (2002) (stating *411 that the dissolution of a partnership at will is caused by a partner giving notice of "express will to withdraw as a partner");[4]Fisher v. Grady, 131 Fla. 1, 178 So. 852, 859 (1937) ("[A]s a general rule, any change in the membership of a firm operates as a dissolution of the same and the formation of a new partnership.").
Similar to the partnership dissolution in Schweiger, Johnston v. Dockside Fueling of North America, Inc., 658 So.2d 618 (Fla. 3rd DCA 1995), involved an effort by a new corporation to enforce a noncompete agreement entered into by a former employee and a dissolved corporation. The Third District cited Schweiger with approval and held that the employee's continued employment with the new corporation was insufficient to constitute consent to the assignment. See id. at 619.
In Strehlow v. Legend Equities Corp., 727 So.2d 1076 (Fla. 4th DCA 1999), the Fourth District relied on Schweiger and Johnston in reversing a temporary injunction enforcing nonsolicitation clauses of the appellants' sales representative contracts, signed in 1989 "[w]hen ... they worked for a different company." Id. at 1076-77. The sales representatives had not consented to assignment of the contracts to the appellee corporation when it purchased the business with which the representatives had originally contracted. See id. at 1077. Unlike Schweiger and Johnston, the cases on which the Fourth District relied, the opinion in Strehlow does not reflect whether the corporation that originally entered into the contract was dissolved.
In the conflict case, Sears Termite, the First District reversed the denial of a temporary injunction sought against two former employees of All America Termite and Pest Control after it was sold to Sears in a 100 percent stock sale. 745 So.2d at 486. The First District held that the stock sale did not affect All America's contractual rights and obligations, and a subsequent name change did not affect the corporate identity. Thus, assignment of the employment contracts was unnecessary. See id.
We disagree with the Fifth District's conclusion that the reasoning of Schweiger, a case involving partnerships, is applicable to other forms of commercial transactions without regard to the legal ramifications of the transaction. We begin with a discussion of the effect of a 100 percent stock purchase on a corporation's existence. Unlike partnerships, a corporate entity is not dissolved by a change of ownership. See St. Petersburg Sheraton Corp. v. Stuart, 242 So.2d 185, 190 (Fla. 2d DCA 1970) ("Ownership by one corporation of all the stock of another corporation does not destroy the identity of the latter as a distinct legal entity...."). In fact, a foundation of corporate law is that, unlike a partnership or a sole proprietorship, the existence of a corporate entity is not affected by changes in its ownership or changes in management. See Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001) ("The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status."); see also Am. States Ins. Co. v. Kelley, 446 So.2d 1085, 1086 (Fla. 4th DCA 1984) ("The general *412 rule is that corporations are legal entities separate and distinct from the persons comprising them."). Moreover, there is a "clear distinction between the transfer of an asset of a corporation, such as a franchise agreement, and a transfer of the stock in a corporation itself." Hawkins v. Ford Motor Co., 748 So.2d 993, 1000 (Fla. 1999). Cf. Cruising World, Inc. v. Westermeyer, 351 So.2d 371, 373 (Fla. 2d DCA 1977) (stating that a share of stock does not vest owner with any right or title to any of corporation's property). With a stock purchase, the corporation whose stock is acquired continues in existence, even though there may be a change in its management. As explained in Sears Termite, the "fact that there is a change in ownership of corporate stock does not affect the corporation's existence or its contract rights, or its liabilities." 745 So.2d at 486.
In contrast to a sale of corporate stock, in a sale of corporate assets the transaction introduces into the equation an entirely different entity, the acquiring business. The asset sale to that entity may include some or all of the corporate assets, and the transferred assets may include tangibles such as machinery and intangibles such as accounts receivable. See § 607.1202(1), Fla. Stat. (2002) ("A corporation may sell, lease, exchange, or otherwise dispose of all, or substantially all, of its property...."). A corporation that sells its assets may continue in existence, may dissolve, or may merge with the entity that purchased its assets. See Best Towing & Recovery, Inc. v. Beggs, 531 So.2d 243, 245 (Fla. 2d DCA 1988) (noting that pursuant to an agreement, a transfer of assets may immediately dissolve a corporation).
A corporation that acquires the assets of another business entity does not as a matter of law assume the liabilities of the prior business. See Bernard v. Kee Mfg. Co., 409 So.2d 1047, 1049 (Fla.1982). In Bernard, this Court declined to impose product liability on a successor corporation that purchased the assets of the manufacturer of a defective product and continued the product line under the same trade name, but discontinued the allegedly defective model. See id. at 1048. This Court set out the generally accepted rule applicable to an asset purchase:
The vast majority of jurisdictions follow the traditional corporate law rule which does not impose the liabilities of the selling predecessor upon the buying successor company unless (1) the successor expressly or impliedly assumes obligations of the predecessor, (2) the transaction is a de facto merger, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor. See Sens v. Slavia, Inc., 304 So.2d 438 (Fla.1974); 15 W. Fletcher, Cyclopedia of the Law of Private Corporations §§ 7122, 7123 (rev. perm. ed. 1973 Note, Products LiabilityLiability of Transferee for Defective Products Manufactured by Transferor, 30 Vand. L.Rev. 238, 243 (1977).
Id. at 1049. The Court expressly "adhere[d] to the traditional corporate law rule." Id. at 1051.
In an asset purchase, the liabilities and responsibilities of each party would be set forth in the parties' agreement. See William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations, § 7122 (perm.ed., rev.vol.1990) ("The general rule ... is that where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor.... An express agreement, or one that can be implied, to assume the *413 other company's debts and obligations, is necessary...."). Thus, when the sale of the assets includes a personal service contract that contains a noncompete agreement, the purchaser can enforce its terms only with the employee's consent to an assignment. See, e.g., Pino v. Spanish Broad. Sys. of Fla., Inc., 564 So.2d 186, 189 (Fla. 3d DCA 1990) (holding that because contract containing covenant not to compete included a provision permitting assignment, the covenant was assignable and enforceable by business that bought assets of employee's former employer).[5]
We next address a corporate merger, which is also involved in this case. Under longstanding precedent, on the date of a merger the surviving corporation becomes "liable for the debts, contracts and torts" of the former corporation. Barnes v. Liebig, 146 Fla. 219, 1 So.2d 247, 253 (1941). This principle is codified in section 607.1106, Florida Statutes (2002), which provides in pertinent part:
(1) When a merger becomes effective:
(a) Every other corporation party to the merger merges into the surviving corporation and the separate existence of every corporation except the surviving corporation ceases;
(b) The title to all real estate and other property, or any interest therein, owned by each corporation party to the merger is vested in the surviving corporation without reversion or impairment;
(c) The surviving corporation shall thenceforth be responsible and liable for all the liabilities and obligations of each corporation party to the merger[.]
This provision has remained unchanged since its 1989 enactment and thus contains the statutory language applicable at the time of the mergers in this case. Prior to the enactment of section 607.1106, section 607.231(3), Florida Statutes (1987), similarly provided that the surviving corporation of a merger "shall have all the rights, privileges, immunities and powers, and shall be subject to all of the duties and liabilities" of the merged corporation.
Precedent applying these provisions demonstrates the passage of the obligations and rights of a merged corporation to the survivor of the merger. In Celotex Corp. v. Pickett, 490 So.2d 35, 37 (Fla. 1986), this Court construed section 607.231(3) to hold Celotex liable for punitive damages stemming from a shipyard worker's exposure to asbestos manufactured by a corporation it had absorbed in a merger. This Court stated:
Where two corporations have truly merged, a corporate tortfeasor by any other name is still a tortfeasor, to paraphrase Shakespeare. See, e.g., Moe v. Transamerica Title Insurance Co., 21 Cal.App.3d 289, 98 Cal.Rpt[r]. 547, 556-57 (1971) (merger "merely directs the blood of the old corporation into the veins of the new, the old living in the new"); Atlanta Newspapers, Inc. v. Doyal, 84 Ga.App. 122, 128, 65 S.E.2d 432, 437 (1951) (merger "is like the uniting of two or more rivers, neither stream is annihilated, but all continue in existence").
Id. at 38. In Nelson v. Ameriquest Technologies, Inc., 739 So.2d 161, 164 (Fla. 3d DCA 1999), the Third District cited section 607.1106(1)(b) in holding that a guarantee in a dealer application could be enforced by the surviving corporation in a merger. See also Coulter Corp. v. Leinert, 869 F.Supp. 732, 734 (E.D.Mo.1994) (noting that under Florida law, the "the rights and *414 liabilities of merging corporations are retained by the surviving corporation").
Based on the language in Florida's statute as well as the decisions in Barnes and Celotex, we conclude that the surviving corporation in a merger assumes the right to enforce a noncompete agreement entered into with an employee of the merged corporation by operation of law, and no assignment is necessary. This is because in a merger, the two corporations in essence unite into a single corporate existence.
Accordingly, based on fundamental principles of commercial transactions and the applicable statutes, we hold that, in contrast to an asset purchase, neither a 100 percent purchase of corporate stock nor a corporate merger affects the enforceability of a noncompete agreement. This holding is in accord with our decisions in both Bernard and Celotex where we have followed the traditional principles of corporate law in determining the obligations and liabilities of a successor corporation. This holding also "conforms with the policy of preserving the sanctity of contract and providing uniformity and certainty in commercial transactions." Pino, 564 So.2d at 189.
In light of these settled principles governing dissolutions, asset sales, stock sales, and mergers, we expressly reject the Fifth District's conclusion that "[t]he fact that after the change in ownership or stock sale or name change, liabilities or property rights are not changed, is irrelevant to the issue in this case." Corporate Express, 800 So.2d at 620. In eschewing reliance on the form of the commercial transaction in favor of a "culture and mode of operation" analysis, see id., the Fifth District has substituted a novel test of changing corporate identity based on changes in corporate culture and mode of operation for well-established principles of commercial transactions.
Reliance on changes in corporate culture and mode of operation as a measure of whether an employer has changed identity and therefore must obtain a consensual assignment of a noncompete agreement would inject unnecessary uncertainty into corporate transactions. Changes in corporate culture occur frequently, often in response to market forces and without a corresponding change in corporate structure. As long as the other prerequisites to the validity of a noncompete agreement are met, neither a 100 percent stock purchase nor a merger affects the enforceability of the agreement.

THIS CASE
The foregoing analysis leads us to conclude that the noncompete agreements between former employees Goff, Phillips, and Farrell and their original employers were enforceable by Corporate Express. As to Phillips and Farrell, CES initially acquired the rights to their noncompete agreements in the 100 percent stock purchase from Bishop. Following the purchase of the stock of Bishop by CES, Bishop continued to operate as an ongoing corporation, and thus no assignment of the noncompete agreement to CES was necessary. During the time it was under CES's ownership, only Bishop could enforce the agreement because the stock purchase by CES did not give CES the right to enforce the agreement under its own name. Pursuant to the law of commercial transactions discussed above, the 100 percent stock sale by Bishop to CES did not change the identity of Phillips' and Farrell's employer. That employer continued to be Bishop. However, in the ensuing mergers of Bishop into CES and CES into CEE (later renamed Corporate Express), *415 the noncompete agreements passed by operation of law to the surviving corporation.
With regard to the Ciera transaction, CES purchased the assets of Ciera and accordingly a consent to assignment was necessary. In fact, as part of the asset purchase of Ciera by CES, Goff executed a consent to the assignment of his noncompete agreement. The rights in the agreement passed to CES as part of Goff's consensual assignment of his noncompete agreement with Ciera. Subsequently, as with the commercial transaction with Bishop, the noncompete agreement passed by operation of law as a result of the ensuing mergers.[6]
In both cases, just as Corporate Express would have been responsible as the surviving corporation for any liabilities arising from the contracts of employment, so is it entitled to the benefit of the noncompete agreements. As the First District recognized in Sears Termite, neither a change in the ownership of corporate stock nor a name change alters a corporation's existence, corporate identity, or corporate rights. See 745 So.2d at 486. Therefore, in contrast to Schweiger and Johnston where the original business entities were dissolved, no additional assignments necessitating the employees' consent were required to enable Corporate Express to seek enforcement of the noncompete agreements.[7]

CONCLUSION
For these reasons, we quash the Fifth District decision in this case and approve the First District decision in Sears Termite. We remand this case to the Fifth District for proceedings consistent with this opinion.
It is so ordered.
ANSTEAD, C.J., WELLS, LEWIS, QUINCE, and CANTERO, JJ., and SHAW, Senior Justice, concur.
NOTES
[1] The Fifth District did not address the validity of the injunction regarding the use and disclosure of trade secrets, and this issue is not before us. See Corporate Express, 800 So.2d at 621.
[2] According to the Senate Staff Analysis, section 542.335 "substantially expands and clarifies the noncompete statute governing validity and enforcement of contracts in restraint of trade." Fla. S. Comm. on Judiciary, SB 282 (1996) Staff Analysis 5 (Mar. 27, 1996). Section 542.335(1) allows for enforcement of contracts that restrict or prohibit competition so long as the contracts are "reasonable in time, area, and line of business." Section 542.335(1)(h) provides that a court "shall construe a restrictive covenant in favor of providing reasonable protection to all legitimate interests established by the person seeking enforcement." Section 542.335(1)(i) further provides:

No court may refuse enforcement of an otherwise enforceable restrictive covenant on the ground that the contract violates public policy unless such public policy is articulated specifically by the court and the court finds that the specified public policy requirements substantially outweigh the need to protect the legitimate business interest or interests established by the person seeking enforcement of the restraint.
[3] Section 542.33 contains no mention of assignments. See Pino v. Spanish Broad. Sys. of Fla., Inc., 564 So.2d 186, 188-89 (Fla. 3d DCA 1990) (legislature in enacting section 542.33 merely granted right to freely contract for covenants not to compete, and "did not intend to extinguish" right to assign personal service contracts containing covenants not to compete). Section 542.335, enacted in 1996, now provides in pertinent part:

(1) ... In any action concerning enforcement of a restrictive covenant:
....
(f) The court shall not refuse enforcement of a restrictive covenant on the ground that the person seeking enforcement is a third-party beneficiary of such contract or is an assignee or successor to a party to such contract, provided:
1. In the case of a third-party beneficiary, the restrictive covenant expressly identified the person as a third-party beneficiary of the contract and expressly stated that the restrictive covenant was intended for the benefit of such person.
2. In the case of an assignee or successor, the restrictive covenant expressly authorized enforcement by a party's assignee or successor.
Section 542.335(1)(f) applies only to noncompete agreements entered into after July 1, 1996. Section 542.33 remains applicable as to all agreements entered prior thereto. We express no opinion whether, as to noncompete agreements entered into after July 1, 1996, section 542.335 changes the law regarding assignments, because that issue is not before us and neither the First District nor the Fifth District relied on this statute in its analysis.
[4] This provision, part of the "Revised Partnership Act of 1995," replaced former section 620.70, Florida Statutes (1997), effective January 1, 1998. Section 620.70 provided that dissolution is caused by a partner "ceasing to be associated in the carrying on ... of the business." Unlike section 620.8801, section 620.70 did not distinguish, for purposes of determining when a dissolution has occurred, between partnerships at will and partnerships for a definite term or particular purpose.
[5] The employment contract in Pino provided that it was "transferable or assignable" and "shall be binding upon and inure to the benefit" of the employer's "successors or assigns." Id. at 187.
[6] Corporate Express's status as a Delaware company does not change this analysis, because Delaware's law is no different. Under the law of Delaware as well as Florida, the rights of the merged corporation become those of the surviving corporation. See PPG Indust., Inc., v. Guardian Indust. Corp., 597 F.2d 1090, 1095-96 (6th Cir.1979); Koppers Coal & Transportation Co. v. United States, 107 F.2d 706, 707 (3d Cir.1939). Because Delaware law is not inconsistent with Florida law on the effect of a merger, Florida law applies. See § 607.1107(4), Fla. Stat. (2002) ("If the surviving corporation is to be governed by the laws of any state other than this state, the effect of such merger shall be the same as in the merger of domestic corporations except insofar as the laws of such other state provide otherwise.").
[7] We decline to address the remaining issues raised by the parties that are beyond the scope of the conflict issue. See Kelly v. Comty. Hosp. of Palm Beaches, Inc., 818 So.2d 469, 470 n. 1 (Fla.2002).