DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**R.J. REYNOLDS TOBACCO COMPANY,**
Appellant,

v.

**STATE OF FLORIDA** and **PHILIP MORRIS USA INC.,**
Appellees.

_____

No. 4D18-2616

_____

**PHILIP MORRIS USA INC.,**
Appellant,

v.

**ITG BRANDS, LLC,**
Appellee.

_____

No. 4D18-2715

_____

[July 29, 2020]

Consolidated appeals from the Circuit Court for the Fifteenth Judicial
Circuit, Palm Beach County; Jeffrey Dana Gillen, Judge; L.T. Case No. 50-
1995-CA-001466-OCAE-MB.

Elliot H. Scherker, Brigid F. Cech Samole, and Stephanie L. Varela of
Greenberg Traurig, P.A., Miami, for appellant R.J. Reynolds Tobacco
Company.

Paul Vizcarrondo and Ben M. Germana of Wachtell, Lipton, Rosen &
Katz, New York, New York, and David P. Ackerman and E. Raul Novoa Jr.
of Akerman LLP, West Palm Beach, for appellee Philip Morris USA Inc.

Ashley Moody, Attorney General, Amit Agarwal, Solicitor General, Edward M. Wenger, Chief Deputy Solicitor General, and Russell Kent, Special Counsel for Litigation, Office of the Attorney General, Tallahassee; and Scott B. Cosgrove and Jeremy L. Kahn of León Cosgrove, LLP, Coral Gables, for appellee State of Florida.

Elizabeth B. McCallum and Robert J. Brookhiser Jr. of Baker & Hostetler, LLP, Washington, D.C., and James V. Etscorn and Robert W. Thielhelm Jr. of Baker & Hostetler, LLP, Orlando, for appellee ITG Brands, LLC.

LEVINE, C.J.

This is a tale of two contracts. One contract, the Florida Settlement Agreement ("FSA") entered in 1997, in which appellant Reynolds agreed to make large payments to the State of Florida in perpetuity, based on the future sales of its brands of cigarettes in order to settle all claims of liability resulting from past and future medical costs to the state. The other contract, the Asset Purchase Agreement ("APA"), entered in 2014, where Reynolds sold four brands of cigarettes to ITG Brands for seven billion dollars. Reynolds now claims that due to the sale of these four brands, it is no longer required to pay the state under the contract it agreed to in 1997. It claims the cigarettes sold under these four brands are no longer the responsibility of Reynolds since they are no longer part of Reynolds's market share and that ITG, the new owner of these brands, had agreed to use "reasonable best efforts" to become part of the FSA.

We find that the second contract, the APA, between Reynolds and ITG did not in any way vitiate the responsibilities and obligations of Reynolds under the first contract, the FSA, to the State of Florida. We find the FSA to be a clear and unambiguous contract which required any amendment to the contract to be in writing and agreed to by all the parties to the contract. We find that the FSA required payments in perpetuity in exchange for the release of liability for past and future medical bills payable by the State of Florida.

We find, simply put, that a contract is a contract, and that Reynolds continues to be liable under the contract it signed with the State of Florida. Thus, we affirm.

**Florida Settlement Agreement**

In 1995, Florida filed a complaint against major tobacco companies, including Reynolds, Philip Morris, and others, to recoup healthcare costs

incurred by the State of Florida due to the consumption of cigarettes. The parties settled the complaint from which came the Florida Settlement Agreement ("FSA") in 1997. The settlement was "binding upon all Settling Defendants and their successors and assigns." The "Settling Defendants" were defined as "those Defendants in this Action that are signatories to this Settlement Agreement," like Reynolds and Philip Morris. The Settling Defendants would make an initial payment and then annual payments in perpetuity based on their Market Share of the sales of cigarettes as follows in the FSA:

> 7. <u>Annual Payments.</u> Each of the Settling Defendants agrees that on or before September 15, 1998 it shall severally cause to be paid to an account designated in writing by the State of Florida, <u>pro</u> <u>rata</u> in proportion to its respective Market Share and in accordance with and subject to paragraph 18 of this Stipulation of Amendment, its share of $220 million (subject to adjustment for appropriate allocation among Settling Defendants by January 30, 1999).

> Each of the Settling Defendants further agrees that, on or before December 31, 1999 and annually thereafter on or before December 31st of each year after 1999 (subject to final adjustment within 30 days), it shall severally cause to be paid into an account designated by the State of Florida, <u>pro</u> <u>rata</u> in proportion to its respective Market Share and in accordance with and subject to paragraph 18 of this Stipulation of Amendment, its share of 5.5% of the following amounts (in billions):

| <u>Year</u> | 1999 | 2000 | 2001 | 2002 | 2003 | thereafter |
|---|---|---|---|---|---|---|
| <u>Amount</u> | $4.5B | $5B | $6.5B | $6.5B | $8B | $8B |

> The payments made by Settling Defendants pursuant to this paragraph 7 shall be adjusted upward by the greater of 3% or the actual total percent change in the Consumer Price Index applied each year on the previous year, beginning with the annual payment due on December 31, 1999. Such payments will also be decreased or increased, as the case may be, beginning with the annual payment due on December 31, 1999, in accordance with the formula for adjustment of payments set forth in Appendix A hereto. Settling Defendants shall pay the payment due on September 15, 1998 without adjustment for inflation or in accordance with the formula for

adjustments of payments set forth in Appendix A hereto. This paragraph 7 supersedes section II.B(3) of the Settlement Agreement, which is hereby rendered null, void and of no further effect.

"Market Share," in turn, was defined as "a Settling Defendant's respective share of sales of Cigarettes, by number of individual Cigarettes shipped in the United States for domestic consumption . . . ."

In exchange for the payments in perpetuity from the Settling Defendants, Florida released the settling tobacco companies from past as well as future liability. At one point in the agreement, it stated that "[t]he payments to be made by Settling Defendants under the Settlement Agreement and this Stipulation of Amendment are in settlement of all of the State of Florida's claims for damages incurred by the State in the year of payment or earlier years related to the subject matter of this Action . . . ." At another point in the agreement, it stated that the payments in perpetuity were "to reimburse the State of Florida for medical expenses incurred by the State . . . ."

Merged as part of the FSA was a Florida Fee Payment Agreement, in which the Settling Defendants agreed to pay Florida's attorneys' fees. The fees due and owing would be made by the Settling Defendants in pro rata proportion to their respective Market Share, just like the method outlined in the FSA. A merger clause stated:

> The Settlement Agreement (including this Stipulation of Amendment, Florida Fee Payment Agreement and the Consent Decree) contains an entire, complete and integrated statement of each and every term and provision agreed to by and among the parties hereto relating in any way to the settlement of the tobacco litigation brought by the State of Florida, and is not subject to any condition not provided for herein.

Significantly, the FSA could be "amended only by a writing executed by all signatories hereto and any provision hereof may be waived only by an instrument in writing executed by the waiving party." There is no evidence in this record of any writing executed by any of the parties waiving or changing any of the terms of the FSA with respect to Reynolds's liability for payments.

The FSA, unlike a prior settlement agreement negotiated a year before between Liggett and the State of Florida, and the Master Settlement Agreement between 46 states and the Settling Defendants, did not include

4

a provision for brand transfer. The Liggett Agreement and the Master Settlement Agreement both required that the party acquiring a brand transfer agree to be bound by all the obligations of the Settling Defendant. No such requirement releasing the Settling Defendant or obligating the acquiring defendant is present in the FSA.

**Asset Purchase Agreement**

In 2014, Reynolds entered into an Asset Purchase Agreement ("APA") with ITG, a non-Settling Defendant, to sell four brands of cigarettes, including Winston, KOOL, Salem, and Maverick, referred to as the "Acquired Brands," for seven billion dollars. Reynolds divested itself of the brands as a result of antitrust considerations that arose from a previous merger with Liggett. ITG agreed to "purchase, acquire and accept" all of Reynolds's "right, title and interest" in the Acquired Brands. Part of the "right, title and interest" acquired by ITG were "all benefits and credits under the State Settlements in respect of the Acquired Brands that relate to the period after the Closing Date." Additionally, ITG was to assume "all Liabilities under the State Settlements in respect of the Acquired Tobacco Cigarette Brands that relate to the period after the Closing Date." An exhibit to the APA stated that ITG was to "use its reasonable best efforts to reach agreements with each of the Previously Settled States, by which [ITG] will assume, as of the Closing, the obligations of a Settling Defendant under the . . . Agreement with each such State."

Another exhibit to the APA stated that ITG would receive the benefit of a Previously Settled States Reduction:

> Section 4.1 The Acquiror's assumption of the obligations of an OPM [Original Participating Manufacturer] with respect to the Acquired Tobacco Cigarette Brands includes receiving the benefit of the credits and reductions and other calculations applied to brands owned by an OPM under the MSA [Master Settlement Agreement] with respect to the period after the Closing. This includes, without limitation, receiving the benefit of the Previously Settled States Reduction.

Following the execution of the APA, neither Reynolds nor ITG made the required annual payment to the State of Florida for the Acquired Brands pursuant to the FSA. ITG never executed an amendment to the FSA to become a party to the FSA. Reynolds, although it discontinued annual payments to the State of Florida pursuant to the FSA, continued to pay attorneys' fees pursuant to the Florida Fee Payment Agreement.

5

**Litigation Ensues**

After Reynolds and ITG refused to make settlement payments pursuant to the FSA for the four Acquired Brands, litigation resulted in Florida and other states.[1] In 2017, Florida moved to enforce the FSA against both Reynolds and ITG, who was added as a party defendant. Philip Morris also moved to enforce the FSA because of increased payment obligations it had incurred. Florida and Philip Morris argued that Reynolds remained liable for payments under the FSA and, additionally, that ITG assumed liability under the APA.

The trial court found that ITG was not liable as a successor or assign because under the APA, ITG merely agreed to use "reasonable best efforts" to enter into an agreement with Florida to assume liabilities under the FSA. The trial court found that Reynolds continued to be liable for payments under the FSA. The trial court stated:

> [N]othing in the [FSA] allows Reynolds to relieve itself from its obligations unless the transferee becomes a successor or assign/assignee. As is manifestly obvious, there can be no successor or assign/assignee unless the transferee-entity agrees to be bound by all, not merely some, of the provisions of the [FSA]. Under the asset-purchase agreement, Reynolds and [ITG] simply set the stage for the latter to become the former's successor or assign/assignee. . . .
>
> [T]he fact Reynolds contracted with [ITG] to continue to pay Florida under the fee-payment agreement does prove that Reynolds understood that it was obligated to persuade [ITG] to become --- not merely endeavor to become --- Reynolds' successor or assign with respect to all Florida.

(emphasis omitted).

The trial court entered a final judgment ordering that Reynolds pay $92,620,158.99 to Florida and $9,828,088.70 to Philip Morris, for a total in excess of $102.4 million. The court reiterated that "under the Florida Settlement Agreement, a Settling Defendant that transfers a cigarette brand to an entity that is not, and does not become, a Settling Defendant will remain liable for the subsequent sales of cigarettes under that brand

---

[1] Reynolds and ITG sued each other in Delaware to determine their contractual rights with respect to each other. We make no comment on the merits of that matter.

(or brands, as the case may be) when making its settlement payments." The trial court directed that the "settlement payments must be calculated as if the transaction with ITG Brands had not occurred . . . ."

Reynolds filed a notice of appeal. Philip Morris filed a separate notice of appeal, challenging the trial court's ruling finding ITG not liable.

## R.J. Reynolds Appeal

"A trial court's interpretation of a contract is subject to de novo review. The court's findings of fact are reviewed using a substantial and competent evidence standard." *Boca Concepts, Inc. v. Metal Shield Corp.*, 78 So. 3d 567, 570 (Fla. 4th DCA 2011) (citation omitted).

"As settlement agreements are contractual in nature, they are interpreted and governed by contract law." *Barone v. Rogers*, 930 So. 2d 761, 763-64 (Fla. 4th DCA 2006). "Where contracts are clear and unambiguous, they should be construed as written . . . from the words of the entire contract." *Khosrow Maleki, P.A. v. M.A. Hajianpour, M.D., P.A.*, 771 So. 2d 628, 631 (Fla. 4th DCA 2000). "Courts are required to construe a contract as a whole and give effect, where possible, to every provision of the agreement." *Anarkali Boutique, Inc. v. Ortiz*, 104 So. 3d 1202, 1205 (Fla. 4th DCA 2012) (citation omitted).

Affirmance is warranted because under the clear and unambiguous language of the FSA, Reynolds remained liable for annual payments of the Acquired Brands. The FSA required that Reynolds make annual payments to the State of Florida in perpetuity, with no condition of termination, in exchange for the release of liability for past and future medical costs incurred by the State of Florida. Significantly, the FSA could be "amended only by a writing executed by all signatories hereto and any provision hereof may be waived only by an instrument in writing executed by the waiving party." It is undisputed that there was no written agreement by the signatories to the FSA altering or waiving Reynolds's payment obligations to Florida. In the absence of such a written amendment, Reynolds's payment obligations continued in full force and effect under the FSA. Thus, the lack of any such written agreement altering or waiving conditions of the contract alone compels affirmance.

The Florida Fee Payment Agreement also supports a finding of Reynolds's continuing liability. Under the Florida Fee Payment Agreement, which was merged into the FSA, Reynolds agreed to be liable for attorneys' fees incurred by Florida. Although Reynolds omitted the Acquired Brands from its Market Share for purposes of annual payments under the FSA

after it sold the Acquired Brands, it continued to include the same Acquired Brands in its Market Share for purposes of payments of attorneys' fees. Reynolds's agreement to be liable for attorneys' fees, and its continued payment of attorneys' fees, is consistent with a finding and understanding that Reynolds continued to be liable for annual payments to Florida, as both were calculated based on the same Market Share provision. *See In re Failla,* 838 F.3d 1170, 1176-77 (11th Cir. 2016) ("The presumption of consistent usage instructs that '[a] word or phrase is presumed to bear the same meaning throughout a text . . . .'") (quoting Antonin Scalia & Bryan A. Garner, *Reading Law* 170 (2012)). If Reynolds is liable for attorneys' fees pursuant to Market Share, then it stands to reason, within the same FSA, that Reynolds would also be liable for annual payments pursuant to the same Market Share provision.

The APA did not, and could not, alter Reynolds's continuing payment obligations to the State of Florida. The APA could not extinguish Reynolds's responsibilities and obligations under the FSA, as it was a separate agreement not involving all the parties to the FSA. Moreover, the APA did not contain a specific provision requiring ITG to make payments on the Acquired Brands. "A corporation that acquires the assets of another business entity does not as a matter of law assume the liabilities of the prior business." *Corp. Exp. Office Prods., Inc. v. Phillips*, 847 So. 2d 406, 412 (Fla. 2003). "[T]he parties must agree to a contract which is intended to take the place of a prior obligation." *Moring v. Miller*, 330 So. 2d 93, 95 (Fla. 1st DCA 1976). "[M]ere acceptance of the obligation of the assignee without any intention to relieve the original debtor is not, in and of itself, sufficient . . . ." *Id.*

Although the APA stated that ITG assumed Reynolds's liabilities under the FSA, it also stated that ITG had to use "reasonable best efforts" to reach an agreement with Florida to become a party to the FSA. It is undisputed that ITG never became a party to the FSA. Having never become a party to the FSA, ITG was not bound by the provisions of that agreement. *See Phillips*, 847 So. 2d at 412; *Moring*, 330 So. 2d at 95. *See also Gee v. Tenneco, Inc.*, 615 F.2d 857, 862 (9th Cir. 1980) ("[N]o rule of law . . . allows a corporate entity to evade liability for its tortious conduct merely by selling the instrumentality which is alleged to have caused the injury . . . ."); 19 C.J.S. *Corporations* § 735 (2020) ("[T]he mere transfer of the assets of one corporation to another corporation or individual generally does not make the latter liable for the debts or liabilities of the first corporation.").

Reynolds argues that once it stopped manufacturing, selling, and shipping the Acquired Brands, they were no longer part of its Market Share

8

for purposes of calculating the annual payments. Reynolds's argument is inconsistent with the clear and unambiguous language of the FSA. Nothing in the Market Share provision establishes that assignment of the Acquired Brands to ITG somehow extinguishes Reynolds's liability in the absence of a signed written agreement to the FSA. Finally, the assignment of the Acquired Brands to ITG does not change the fact that ITG did not assume the obligation to make payments on the Acquired Brands.

Two cases from Texas and Minnesota are instructive. In both cases, each court similarly rejected Reynolds's argument and concluded that Reynolds continued to remain liable for payments to the state under settlement agreements even after assigning the acquired brands to ITG. *See Texas v. Am. Tobacco Co.*, 5:96-CV-00091-JRG, 2020 WL 991784 (E.D. Tex. Feb. 25, 2020); *In Re Petition of the State of Minnesota for an Order Compelling Payment of Settlement Proceeds Related to ITG Brands, LLC*, No. 62-CV-18-1912 (Sept. 24, 2019). In both those cases, like this case, the state entered into a settlement agreement with tobacco companies providing for annual payments in perpetuity based on Market Share. After selling the Acquired Brands to ITG, like the present case, neither Reynolds nor ITG made annual payments to the state.

The Texas court found that Reynolds remained liable under the common law because mere assignment does not extinguish liability. *Am. Tobacco Co.*, 2020 WL 991784, at *38. The court also found liability under the plain language of the settlement agreement, which provided for perpetual payments with no termination condition, did not contain a "release upon assignment" provision, and required the other parties' prior written consent to extinguish an obligation. *Id.* at *35, 39-40. The settlement's purpose of reimbursement of healthcare expenses further supported Reynolds's continued liability. *Id.* at *33-34. The court rejected Reynolds's argument that its liability was extinguished by the Market Share provision, concluding "that the Market Share provision does not apply to the legal question of liability following an assignment." *Id.* at *41. Finally, the court found that "Reynolds' continued inclusion of the Acquired Brands in its Market Share payment to Texas' Private Counsel is tantamount to an admission by Reynolds that it remains liable to Texas." *Id.*

The Minnesota court, in an Order and Memorandum addressing cross-motions for summary judgment, similarly held Reynolds liable. The court rejected Reynolds's contention that its liability was limited by the Market Share provision, concluding that Reynolds remained liable absent an agreement otherwise. *In Re Petition*, No. 62-CV-18-1912, at 15-16. The court further found that allowing Reynolds to escape liability simply by

transferring assets was "absurd" and contrary to the purpose of the agreement, which was to make payments in perpetuity to offset public health care expenditures associated with the use of cigarettes.  *Id.* at 17.

**Philip Morris Appeal**

Philip Morris argues that ITG, in addition to Reynolds, should be liable for annual settlement payments for two reasons: first, ITG received the benefit of a Previously Settled States Reduction under the APA and, second, ITG is a successor and assign under the FSA.

Philip Morris's Previously Settled States Reduction argument is unsupported by the plain language of the exhibit to the APA, which states:

> Section 4.1 The Acquiror's assumption of the obligations of an OPM [Original Participating Manufacturer] with respect to the Acquired Tobacco Cigarette Brands includes receiving the benefit of the credits and reductions and other calculations applied to brands owned by an OPM under the MSA [Master Settlement Agreement] with respect to the period after the Closing.  This includes, without limitation, receiving the benefit of the Previously Settled States Reduction.

Section 4.1 simply states that ITG is entitled to certain rights "*under the MSA.*" (emphasis added).  Section 4.1 does not mention Florida or the FSA or relate to any obligation by ITG to make payments under the FSA. The language of Section 4.1 deals solely with MSA payment calculations. Nothing in Section 4.1 suggests ITG assumed liability for the settlement payments under the FSA.

Nor was ITG liable as Reynolds's successor or assign under the FSA. "A corporation that acquires the assets of another business entity does not as a matter of law assume the liabilities of the prior business."  *Phillips*, 847 So. 2d at 412; *see also Bernard v. Kee Mfg. Co.*, 409 So. 2d 1047, 1049 (Fla. 1982) ("[T]he traditional corporate law rule . . . does not impose the liabilities of the selling predecessor upon the buying successor company unless . . . the successor expressly or impliedly assumes obligations of the predecessor . . . .").

The plain language of the APA makes clear that ITG did not agree to assume the settlement payment obligations.  Rather, ITG agreed only to use its "reasonable best efforts" to try to reach an agreement with Florida to become a party to the FSA, and it is undisputed that ITG never became a party to that agreement.  Therefore, we find the trial court was correct

since ITG was not a successor or assignee of Reynolds. *See Phillips*, 847 So. 2d at 412; *Bernard*, 409 So. 2d at 1049.

**Conclusion**

Reynolds seeks to cease annual payments pursuant to the FSA. This despite a contract requiring payments in perpetuity. It points to the fact that ITG, not Reynolds, presently owns the four Acquired Brands making up that part of the "Market Share." But, as Oliver Wendell Holmes once stated, "[t]he duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it,—and nothing else." *The Path of the Law*, 10 Harv. L. Rev. 457, 462 (1897). In this case, by stopping annual payments, Reynolds breached the FSA and failed the "duty to keep a contract" and thus "must pay damages" by paying what it is required to pay pursuant to the contract.

We find the trial court correctly found that Reynolds remained liable for the annual settlement payments for the Acquired Brands under the clear and unambiguous language of the FSA since, in this case, one contract did not alter the obligations of the other contract. The APA did not, and could not, in any way alter Reynolds's obligation under the FSA. The trial court also correctly found that ITG did not assume liability for payments to Florida under the APA and that ITG was not a successor or assign under the FSA.

We therefore affirm the final judgment in all respects.

*Affirmed.*

DAMOORGIAN and FORST, JJ., concur.

*     *     *

**Not final until disposition of timely filed motion for rehearing.**