Edwin **ROEDER**, M.D., Plaintiff–Respondent,

v.

**FERRELL–DUNCAN CLINIC, INC.,** Defendant–Appellant.

No. 25845.

Missouri Court of Appeals, Southern District, Division Two.

Dec. 23, 2004.

Application for Transfer to Supreme Court Denied Jan. 14, 2005.

Application for Transfer Denied March 1, 2005.

der's professional services to Lester E. Cox Medical Centers ("Cox") without Dr. Roeder's consent.

FDC presents two issues on appeal. First, FDC contends the trial court erred in finding that Dr. Roeder's contract to perform professional medical services could not be assigned to Cox without his consent. Second, FDC contends the trial court erred in concluding that the assignment to Cox constituted a material breach of contract because this conclusion is not supported by the evidence and is based on a misapplication of the law. Finding no merit in either point, we affirm.

### I. Standard of Review

■■■ In this court-tried case, our review is governed by Rule 84.13(d).[1] We must affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Ridgway v. TTnT Development Corp.*, 126 S.W.3d 807, 812 (Mo.App.2004).[2] A judgment is presumed correct, and the appellant has the burden of proving it erroneous. *Wingate v. Griffin*, 610 S.W.2d 417, 419 (Mo.App.1980). We review the evidence and all reasonable inferences in the light most favorable to the judgment and disregard all contrary evidence and inferences. *Arndt v. Beardsley*, 102 S.W.3d 572, 574 (Mo.App.2003). Credibility of the witnesses and the weight to be given to their testimony is for the trial court, which is free to believe none, part, or all of the testimony of any witness. *Keller v. Friendly Ford, Inc.*, 782 S.W.2d 170, 173 (Mo.App.1990). We defer to the

Michael J. Cordonnier and Rick E. Temple, Springfield, MO, for Appellant.

Mathew W. Placzek and Angela Desanctis Myers, Springfield, MO, for Respondent.

JEFFREY W. BATES, Chief Judge.

Ferrell–Duncan Clinic, Inc. ("FDC") appeals from a judgment refusing to enforce a non-compete clause in FDC's contract of employment with Dr. Edwin Roeder ("Dr. Roeder"). The trial court found the non-compete clause unenforceable because FDC breached the employment contract by assigning the right to control Dr. Roe-

1. All references to rules are to the Missouri Rules of Civil Procedure (2004).

2. *Murphy* interpreted the provisions of former Rule 73.01(c). The provisions of that rule were transferred, in essentially the same form, to Rule 84.13(d) effective January 1, 2000.

trial judge's superior opportunity to assess the witnesses' credibility. *Harris v. Lynch,* 940 S.W.2d 42, 45 (Mo.App.1997). No such deference is afforded the trial court, however, when we review its conclusions of law. We independently evaluate whether the trial court properly declared or applied the law to the facts presented. *Schubert v. Trailmobile Trailer, L.L.C.,* 111 S.W.3d 897, 899 (Mo.App.2003); *Rathbun v. CATO Corp.,* 93 S.W.3d 771, 777 (Mo.App.2002). Our summary of the evidence presented at trial, which is set forth below, has been prepared in accordance with these principles.

## II. Facts and Procedural History

Dr. Roeder is a physician specializing in orthopedic surgery. He completed his residency in that specialty in 1997. In 1996, approximately one year before the conclusion of his Texas residency program, he began looking for a job. He made two trips to Springfield, Missouri, that year to interview with FDC, which is a multi-specialty medical clinic employing a large number of physicians. After the interviews were finished, FDC offered Dr. Roeder a position in orthopedics beginning in August 1997.

Dr. Roeder received by mail a proposed contract of employment. The contract, which had been drafted by FDC, was an individual agreement between the clinic and Dr. Roeder. The agreement generically referred to FDC as the "Corporation" and Dr. Roeder as "Doctor." This nine page, single-spaced document contained a number of provisions pertinent to the issues here:

1. The first "WHEREAS" clause of the contract stated that FDC was "a Missouri corporation organized to provide professional services through employment of qualified and duly licensed physicians...."

2. The second "WHEREAS" clause of the contract stated, in pertinent part, that "the parties desire to initiate an employment relationship upon the terms and conditions hereinafter set forth...."

3. Paragraph 2 stated, in pertinent part, that Dr. Roeder "is hereby employed by the Corporation to serve as a practicing physician in connection with the professional practice conducted by the Corporation. The Doctor agrees that all acts and procedures pertaining to the practice of medicine performed during the term of his employment by the Corporation ... shall be for the sole and exclusive benefit of the Corporation which shall be authorized and entitled to receive and collect the said fees and compensation for the services rendered by the Doctor. It is agreed that the Corporation is authorized to assign its obligation to collect said fees and compensation for the services rendered by the Doctor...."

4. Paragraph 13 states, in pertinent part, that "[t]he relationship between the Corporation and the Doctor is that of employer and employee. As an employee the Doctor shall be entitled to participate in any health and disability benefit plans, group life insurance plans, pension and profit sharing plans, or any other benefits offered employees...."

5. Paragraph 16 contained an agreement not to compete which imposed "restrictions on the Doctor's right to practice medicine in competition with the Corporation" for 24 months. This provision had a territorial scope of 10 air miles from FDC's buildings in Springfield, Missouri, and Branson, Missouri.

6. Paragraph 18 stated, in pertinent part: "**APPLICABLE LAW.** This contract is drawn to be effective in, and shall be construed in accordance with, the laws of the State of Missouri. No amendments or variations of the terms of this Contract shall be valid unless made in writing and signed by the Doctor and a duly authorized representative of the Corporation.... This Contract shall be binding upon and inure to the benefit of the parties hereto, their successors, heirs, beneficiaries, assigns and personal representatives."

Because the contract's compensation provision was a production-based model, Dr. Roeder had some concerns which he discussed by telephone with FDC's executive director, Charles McCracken. With McCracken's consent, Dr. Roeder added the following hand-written notations in the margin of the contract before signing it and returning it to FDC: (1) "Physician compensation percentage equal for all orthopedic surgeons"; and (2) "Decision to change compensation percentage will be made by general membership[.]" In December 1996, Dr. Roeder signed the contract and mailed it back to FDC. McCracken initialed the changes to show his approval and then had the contract signed by FDC's president. In August 1997, Dr. Roeder moved to Springfield and began working for FDC.

All of the doctors employed by FDC become eligible to purchase one share of stock in the corporation after one year of employment. Only physicians may purchase stock. Dr. Roeder became a shareholder of FDC on January 1, 1999. As a shareholder, he was entitled to vote on matters FDC's Board of Directors submitted for consideration by the general membership.

In early 2000, FDC was negotiating with Cox over finance matters. At the same time, FDC was reviewing its internal compensation model. At a meeting of the general membership in April 2000, a majority of doctors voted to shift from compensation based on production to compensation based on collections. Dr. Roeder voted against the proposal to change the compensation model. The new model became effective in September 2000.

The next events relevant to the issues presented on appeal occurred in 2002. In prior years, FDC had provided professional liability insurance for its physician-employees through an "occurrence" type liability insurance policy. Early in 2002, FDC was notified by its insurer, Intermed, that it would no longer write an occurrence-based policy and would be converting over to selling only claims-made type policies of professional liability insurance.[3] Coverage under the existing Intermed policy expired on July 5, 2002. FDC obtained three price quotations for other coverage: one for coverage through Cox's self-insurance trust fund; one for claims-made coverage through Intermed; and one for an

---

**3.** There is a very significant difference between the coverage provided by an "occurrence" versus a "claims made" policy. An occurrence policy covers negligent acts or omissions that happen during the policy period, irrespective of when the acts or omissions are discovered or when a claim is actually made. *Northern v. Physicians Defense Ass'n,* 88 S.W.3d 130, 134 (Mo.App.2002). Under a "claims made" policy, coverage is effective when the negligent act or omission is discovered and reported to the insurer during the applicable period, regardless of when the act or omission occurred. *Southeast Bakery Feeds, Inc. v. Ranger Ins. Co.,* 974 S.W.2d 635, 639 (Mo.App.1998). For this reason, there is no coverage for late claims under a "claims made" policy, even if the insurer suffered no prejudice by reason of the delay. *See Insurance Placements, Inc. v. Utica Mut. Ins. Co.,* 917 S.W.2d 592, 597 (Mo.App.1996).

occurrence-based policy from Medical Protective. These three proposals were presented to FDC's general membership at a meeting on May 28, 2002. The members voted to purchase insurance from Medical Protective.

On July 3, 2002, however, FDC was notified by Medical Protective that it was withdrawing certain discounts included in its original quotation. This raised the price of Medical Protective's policy by $800,000 to $900,000. FDC obtained a 14–day extension on the existing Intermed policy and scheduled an emergency meeting of the general membership to discuss the professional liability insurance issue on July 16, 2002.

At the July 16th meeting, there were further presentations to the doctors about the proposals by Cox, Intermed and Medical Protective. Cox's chief executive officer, Larry Wallis, was at the meeting. He told the doctors that, in order to be covered by Cox's self-insurance plan, there would have to be a joint employment agreement that made them Cox's employees "for insurance purposes only." A majority of FDC's physician-shareholders voted at this meeting to obtain professional liability insurance through Cox. Dr. Roeder was present at this meeting and, along with a small number of other doctors, voted against this proposal because he did not want to become an employee of Cox.

On July 20, 2002, FDC and Cox executed a document entitled "Joint Employment Agreement." This agreement contained the following provisions pertinent to the issues presented in this appeal:

1) *Term and Termination.* This agreement shall begin on the date of its execution, and shall continue for an indefinite term. The agreement shall be terminable by either party upon ninety (90) days' written notice to the other.

2) *Joint Employment of Physicians.* During the term of the Agreement, all physicians licensed as such by the State of Missouri and employed by Clinic shall also be employees of [Cox] for the purposes stated herein.

3) *Providing Professional Services, Special Employer.* [Cox] shall be considered the Special Employer of said physicians and shall have control over the professional services of said physicians to the extent that such control does not interfere with the relationship of the physician to the patient, and to the extent that such control does not interfere with the independent physician's exercise of medical judgment in the care of a patient.

4) *Providing Professional Services, General Employer.* Clinic shall continue as the General Employer of said physicians, and shall have control over said physicians, other than over the physicians' professional services. Clinic shall be responsible for the payment of physician compensation and benefits, including health insurance and retirement.

5) *Professional Liability Indemnification and Insurance.* By reason of its status as the Special Employer of the said physicians, [Cox] agrees that it will defend any claim or lawsuit and pay damages assessed against (in the name and on behalf of) Ferrell–Duncan Clinic, Inc., and its employed physicians, or their estates, based on professional services rendered or that should have been rendered, under the same terms and conditions as it provides indemnification and insurance to [Cox's] other physician employees.

This agreement, which was drafted by Cox, was not in existence when the general

membership voted on which one of the three insurance proposals to accept at the meeting on July 16, 2002. After the document was prepared and executed, it was kept by McCracken with FDC's other corporate records. No copies of the agreement were distributed to the general membership.

In mid–2002, Dr. Roeder became concerned because his compensation had decreased under the new collection model, even though he handled as many cases and worked as many hours as in 2001. In November 2002, Dr. Roeder and three other FDC physicians (Dr. Grillot, Dr. Rogers and Dr. Talley) sought legal counsel and jointly hired attorney Mathew Placzek ("Placzek") to represent them.

On November 26, 2002, Placzek sent a letter to McCracken requesting an opportunity to inspect FDC's books and records. That same day, Placzek sent another letter to McCracken which stated, in pertinent part:

> The third subject of this letter is the issue of whether my clients are employees of Cox Health or Ferrell–Duncan Clinic. They have heard a document exists labeling them employees of Cox Health for insurance purposes. Such a document might have a profound effect on their rights with respect to the contracts between them and the Clinic. It might also call into question the legality of their pension profit sharing arrangement, as it relates to other Ferrell–Duncan Clinic employees. Please consider this letter a formal request on behalf of my clients, that you provide me whatever documentation exists that labels them Cox Health employees for insurance purposes. If there is no such documentation, and my clients are proceeding under erroneous assumptions, I would appreciate receiving written confirmation of the same.

On December 4, 2002, McCracken sent Placzek a letter stating that the Joint Employment Agreement was available for inspection at McCracken's office.

On December 17, 2002, Placzek and Dr. Rogers met McCracken in the FDC corporate boardroom and inspected FDC's corporate minutes and the Joint Employment Agreement. This was the first time Dr. Rogers had ever seen the latter document.[4] He and Placzek were permitted to look at the document, but they were not given a copy of it. After inspecting the Joint Employment Agreement, Placzek told McCracken that FDC had breached its contracts with Drs. Roeder, Rogers, Grillot and Talley by executing the agreement.

A few days later, Placzek prepared a proposed lawsuit against FDC to be filed if the parties did not reach a satisfactory settlement. The four plaintiffs in the suit were Drs. Rogers, Roeder, Grillot and Talley. Count II, paragraph 17, of this draft petition alleged that FDC "contractually chose to allow plaintiffs to become employees of Lester E. Cox Medical Center without plaintiffs knowledge or consent and therefore, assigned plaintiffs rights and obligations under said contract to a third party and said assignment constitutes a material breach of said contract." This count further alleged that, due to FDC's breach of its contracts with plaintiffs, the non-compete clauses in the contracts were unenforceable. This proposed lawsuit was hand-delivered to McCracken by the four doctors as a group. He asked them to wait seven to ten days before filing the case to see if they could negotiate a settlement and avoid litigation.

4. Dr. Roeder never saw this document until McCracken's deposition in April, 2003.

On January 22, 2003, Dr. Roeder gave FDC written notice that he was terminating his contract of employment 60 days later. On February 4, 2003, he filed his own, separate lawsuit against FDC. In Count II of the lawsuit, he alleged that the non-compete clause in his contract with FDC was unenforceable for the reasons discussed above, and he sought a declaration from the court to that effect. In March 2003, FDC filed its answer and a counterclaim seeking damages for breach of contract and injunctive relief.

On April 1, 2003, the trial court granted a request for a temporary restraining order ("TRO"), which was effective for 15 days. On April 14, 2003, the court held a hearing on FDC's request for a preliminary injunction. At the conclusion of the hearing, the TRO was extended for three days in order to give the parties time to submit briefs. On April 17, 2003, the trial court dissolved the TRO and denied FDC's request for a preliminary injunction.

The trial was held on June 17, 2003. The parties stipulated that the only remaining issue was FDC's request for a permanent injunction. On August 11, 2003, the trial court entered a final judgment containing extensive findings of fact and conclusions of law. The court found in favor of Dr. Roeder on Count II of his petition and against FDC on its counterclaim. This appeal followed.

## III. Discussion

■ In FDC's first point on appeal, it contends the trial court erred in finding that Dr. Roeder's contract of employment could not be assigned without his contemporaneous consent because the contract contained the following provision: "This Contract shall be binding upon and inure to the benefit of the parties hereto, their successors, heirs, beneficiaries, assigns and personal representatives." FDC claims the inclusion of the word "assigns" in this single provision in the contract permitted it to assign to Cox Dr. Roeder's obligation to perform professional medical services, without any further manifestation of assent to the assignment being required from him. Because the parties' expressly intended that "[t]his contract is drawn to be effective in, and shall be construed in accordance with, the laws of the State of Missouri[,]" we reject FDC's argument as inconsistent with Missouri public policy and long-standing precedent.

■ The contract between FDC and Dr. Roeder created an employment relationship between the parties and obligated Dr. Roeder to provide professional medical services for FDC's sole and exclusive benefit during the term of the agreement. The provision of such services by Dr. Roeder required special knowledge, skill and a relationship of personal confidence between employer and employee. Therefore, the employment contract constituted a personal services contract. *See Sympson v. Rogers*, 406 S.W.2d 26, 30 (Mo.1966). "It is well recognized that in a contract for personal services, which involves special knowledge, skill or a relation of personal confidence, the duty to perform is not assignable without the consent of both parties." *Kenneth D. Corwin, Ltd. v. Missouri Medical Service*, 684 S.W.2d 598, 600 (Mo.App.1985); *see also Sympson*, 406 S.W.2d at 30; *Property Exchange & Sales, Inc., (PESI) by Jacobs v. Bozarth*, 778 S.W.2d 1, 3 n. 1 (Mo.App.1989). Requiring mutual consent to the assignment of a personal services contract promotes an important public policy of this state:

> This contract ... clearly calls for personal services, and involves the relation of personal confidence. The law is well settled that a contract is not assignable without the consent of both parties where the personal acts and qualities of

one of the parties form a material and ingredient part of the contract. In such a case, that is, *where the character, ability, and credit of the party dealt with obviously is of so much importance, one has a right to select and determine with whom one will contract, and cannot have another person thrust upon him without his consent.*

*Allied Pipe Line Corp. v. Studley,* 191 S.W.2d 317, 320 (Mo.App.1946) (emphasis added). The attempted assignment of a personal services contract without the employee's consent is improper, illegal and void. *See Alldredge v. Twenty-Five Thirty-Two Broadway Corp.,* 509 S.W.2d 744, 749 (Mo.App.1974).[5]

Here, Dr. Roeder was hired by FDC to provide professional services as a physician. The Joint Employment Agreement executed by FDC in July 2002 constituted the assignment of his personal services contract because it ceded control over Dr. Roeder's professional services to a third party, Cox. It is undisputed that Dr. Roeder did not consent to the assignment because, when FDC asked employees if they wanted to become employees of Cox for "insurance purposes," he voted against the proposal. Therefore, FDC's attempted assignment of Dr. Roeder's employment contract to Cox without his contemporaneous consent was improper, illegal and void. *See Alldredge,* 509 S.W.2d at 749. "A party cannot be forced to accept of a contract not of his own choosing in the first instance, and his right of choice in this regard is not impaired by any substituted agreement to which he does not yield an intelligent subsequent assent." *D. C. Hardy Implement Co. v. South Bend Iron*

*Works,* 129 Mo. 222, 31 S.W. 599, 599–600 (1895).

Entirely ignoring this line of cases, FDC argues that the inclusion of the word "assigns" in paragraph 18 in Dr. Roeder's contract of employment made it, *ipso facto,* assignable. According to FDC, the following cases support this proposition: *Orthotic & Prosthetic Lab, Inc. v. Pott,* 851 S.W.2d 633 (Mo.App.1993); *Schnucks Twenty-Five, Inc. v. Bettendorf,* 595 S.W.2d 279 (Mo.App.1979); and *Alexander & Alexander, Inc. v. Koelz,* 722 S.W.2d 311 (Mo.App.1986). We find all of these cases are distinguishable from the case at bar.

*Schnucks* dealt with the issue of whether "[a] vendor's covenant not to engage in a similar business, which is found to be reasonable in duration, space and purpose, and which is assignable by its terms, may be enforced by one who purchases from the vendee." *Schnucks,* 595 S.W.2d at 287. The appellate court noted that the prohibition against the assignment of a personal services contract does not apply to such a covenant because it is not deemed to be personal in nature; instead, it is simply incident to the sale of the property and business. *Id.* Since there is no public policy prohibiting the assignment of a covenant not to compete when it is incident to the sale of a business, the appellate court held that the contract contained the following language authorizing its assignment: "Parties bound. This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns of the Seller and the Purchaser." *Id.* *Schnucks* has no application here because

---

**5.** This rule simply reflects a specific application of the general principle that an assignment which violates the public policy of this state is void and unenforceable. *See, e.g., Marvin's Midtown Chiropractic Clinic, L.L.C. v. State Farm Mut. Auto. Ins. Co.,* 142 S.W.3d 751, 754 (Mo.App.2004); *Hays v. Missouri Highways and Transportation Comm'n,* 62 S.W.3d 538, 540 (Mo.App.2001); *Forsthove v. Hardware Dealers Mut. Fire Ins. Co.,* 416 S.W.2d 208, 221–22 (Mo.App.1967).

Missouri public policy does prohibit the assignment of a personal services contract without the mutual assent of both parties. That public policy would be essentially nullified if an employer could avoid its effect by purporting to make the contract binding on the parties' "assigns" at a time when the employee had no knowledge any such assignment was contemplated and without giving the employee an opportunity to give or withhold consent at the time the proposed assignment is to take effect. We do not believe the public policy of this state can or should be subverted by so transparent an artifice as this.

*Orthotic* involved the same issue as *Schnucks* and is, therefore, distinguishable for the same reason. Relying on *Schnucks*, the *Orthotic* court held that "where such a covenant is given in connection with the sale of business accounts, customer lists and goodwill which, as we have determined, are fully assignable to others, it may properly be viewed as incident to the property conveyed." *Orthotic*, 851 S.W.2d at 643 (footnote omitted). The language in the contract, which was essentially the same as in *Schnucks*, was sufficient to authorize the assignment of the covenant not to compete. *Id.* In a footnote, the court noted that "Missouri courts have long recognized a distinction between covenants ancillary to a sale of a business and covenants merely ancillary to an employment contract, showing substantially greater liberality in enforcing the former." *Orthotic*, 851 S.W.2d at 646 n. 4.

■ Once again, this case does not support FDC's position here. The issue we address is not whether a covenant not to compete, incident to the sale of a business, is assignable if the contract permits it; instead, we decide whether a contractual obligation to perform personal services can be assigned absent the mutual and contemporaneous consent of both parties

to the contract. We answer this latter question in the negative and hold that the assignment of a personal services contract, by either the employer or employee, is void and unenforceable unless the other party consents at the time the assignment occurs. *See D.C. Hardy Implement Co.*, 31 S.W. at 599–600; *Alldredge*, 509 S.W.2d at 749.

*Alexander* is similarly inapposite. There, the question presented for decision was "whether the surviving company in a statutory merger can enforce covenants not to compete contained in contracts between the merged company and employees of that company." *Alexander*, 722 S.W.2d at 312. The appellate court held that such covenants not to compete were enforceable because a merger does not constitute a prohibited assignment:

> Employees assert the employment contract at issue in their case is one for personal services, which, as a general rule, cannot be assigned without the consent of the employee. However, a change in the form in which the employer does business such as the merger in this case, while involving a formal transfer from one entity to another, should not be seen as creating an assignment in violation of the rule against the assignment of personal service contracts. The merger here apparently had no affect on the business of employer, which was merely converted from a wholly-owned subsidiary of surviving corporation to an integral corporate part of surviving corporation. Just as the initial acquisition of one company by another by the purchase of stock would not work a change in the business, neither would the merger, a mere change in the form of ownership from indirect to direct, work such a change in the business. As no assignment could occur in the former, no pro-

hibited "assignment" would occur in the latter.

*Id.* at 312–13 (citation omitted). The Joint Employment Agreement between FDC and Cox was not executed because of any merger between those organizations. Each retained its separate corporate existence after that document was signed. Furthermore, it is FDC, not Cox, who is attempting to enforce the covenant not to compete against Dr. Roeder. For all of these reasons, *Alexander* does not aid FDC.

■ Even if we were inclined to accept FDC's interpretation of the cases upon which it relies, its argument would fail for a completely different reason. The contract of employment created a bilateral relationship of employer and employee between FDC and Dr. Roeder and obligated him to provide professional services as a physician for FDC's sole and exclusive benefit. The Joint Employment Agreement purported to materially change this by: (1) converting the employment relationship into a trilateral relationship; (2) granting control over Dr. Roeder's professional services as a physician to Cox; and (3) obligating Dr. Roeder to provide such professional services for the mutual benefit of FDC and Cox. Paragraph 18 of the employment contract specifically stated, in pertinent part, that "[n]o amendments or variations of the terms of this Contract shall be valid unless made in writing and signed by the Doctor and a duly authorized representative of the Corporation." Absent written consent from Dr. Roeder, FDC had no right to unilaterally change the terms of his contract. *See Smith–Scharff Paper Co., Inc. v. Blum,* 813 S.W.2d 27, 29 (Mo.App.1991). FDC's argument in point I ignores this provision in the contract it drafted.

■ In sum, the inclusion of the word "assigns" in the boilerplate language

in paragraph 18, which FDC drafted, can be explained by the fact that the contract specifically reserved to FDC the right to assign its obligation to collect fees and compensation for the services rendered by Dr. Roeder. Even in a personal services contract like this one, the inclusion of such language is appropriate because "the right to receive money due or to become due under a contract, is not personal in nature, and as a general rule is assignable." *Kenneth D. Corwin, Ltd.,* 684 S.W.2d at 600. It would be an inappropriate construction of the contract, however, to go any further than this and conclude that the inclusion of the word "assigns" in this personal services contract makes it assignable without Dr. Roeder's consent. *Cf. Jones v. Joy Manufacturing Co.,* 381 S.W.2d 860, 863 (Mo.1964) (holding that the inclusion of language making a personal services contract binding on the employee's "heirs" was "inappropriate" because "a contract for the rendition by Mr. Jones of unique personal acts, which only he could render, could not be binding on his heirs so as to obligate them to perform these services"). If FDC's argument were correct, each party to the contract would have an equal right to assign the duty to perform to a third party without obtaining consent to the assignment. Thus, Dr. Roeder would have the right to assign his duty to perform professional medical services to any other physician without FDC's consent, and it would be obligated to accept such services regardless of the assignee physician's level of skill, medical specialty, history of malpractice claims, age, experience or other factors that a sensible employer would consider before hiring a doctor. We decline to give the contract of employment such an absurd construction. *See Rathbun v. CATO Corp.,* 93 S.W.3d 771, 781 (Mo.App.2002) (the more probable and reasonable of two available constructions

should be utilized to the exclusion of one which produces· an absurd, and therefore unreasonable, result). Point I is denied.

· In point II, FDC contends the trial court erred in concluding that the assignment of control over Dr. Roeder's professional services to Cox constituted a material breach of the employment contract. FDC claims this conclusion is not supported by the evidence and is an erroneous application of the law for three reasons: (1) FDC had the right to assign Dr. Roeder's contract of employment without breaching the agreement; (2) if there was a breach, it was not material to Dr. Roeder's performance under the contract; and (3) in any event, Dr. Roeder waived any alleged breach by FDC. We consider these arguments *seriatim.*

### Existence of Breach

■ FDC argues that it did not breach any provision of the employment contract by obtaining malpractice insurance through Cox. That is not an accurate statement of what FDC did. Unlike in prior years, FDC did not purchase a typical policy of professional liability insurance from Cox in 2002. Instead, the Joint Employment Agreement executed by FDC purported to make Dr. Roeder an employee of a third party without his consent by assigning control over the performance of Dr. Roeder's professional medical services to Cox. We reject as specious FDC's argument that it was authorized to do this because the vast majority of FDC's physician-shareholders voted to accept Cox's proposal. Dr. Roeder had an individual contract of employment with FDC. The sole provision in the contract that could be changed by a vote of the membership was the compensation provision, which was done in 2000. The express inclusion of this one situation in which Dr. Roeder's contract terms could be changed by a vote

of the general membership implies that it is not permitted in any other instance. *See Brackett v. Easton Boot & Shoe Co.,* 388 S.W.2d 842, 848 (Mo.1965); *General American Life Ins. Co. v. Barrett,* 847 S.W.2d 125, 133 (Mo.App.1993). Therefore, FDC could not change other terms and conditions of Dr. Roeder's contract of employment simply because other employees voted in favor of such changes.

■ FDC also argues that it never promised or guaranteed in the contract that Dr. Roeder would not be jointly employed by another entity or have his contractual duty to perform assigned to someone else. What FDC fails to understand is that this limitation arises as a matter of law from the fact that Dr. Roeder was employed to provide specialized personal services. As a matter of Missouri public policy, his duty to perform such contractual services cannot be assigned to a third party without Dr. Roeder's consent. *See Sympson,* 406 S.W.2d at 30; *Kenneth D. Corwin, Ltd.,* 684 S.W.2d at 600; *Allied Pipe Line Corp.,* 191 S.W.2d at 320. Therefore, the assignment of control over Dr. Roeder's professional services to Cox without his consent was a breach of his contract of employment with FDC. *See D.C. Hardy Implement Co.,* 31 S.W. at 599–600; *Alldredge,* 509 S.W.2d at 749.

### Materiality of Breach

■ FDC next argues that, if it breached the contract, the breach was not material. "The question of whether an employer has materially breached an employment agreement is largely a question of fact for the circuit court." *Washington County Memorial Hosp. v. Sidebottom,* 7 S.W.3d 542, 546 (Mo.App.1999); *see Luketich v. Goedecke, Wood & Co., Inc.,* 835 S.W.2d 504, 507 (Mo.App.1992). The trial court concluded that FDC's execution of the Joint Employment Agreement was ma-

terial for two reasons: (1) the breach goes to the essence of the employer-employee relationship created by the contract in issue, and (2) to hold that the assignment is not a material breach would defeat the entire purpose of Missouri's prohibition against assigning personal services contracts. We agree.

■■■■ One of the fundamental purposes of this state's public policy prohibiting the assignment of personal services contracts is to protect an employee's right to choose the person or entity for whom such services will be performed. Except in those limited circumstances already discussed and distinguished, an employee cannot be forced, via an assignment of the contract, to provide personal services to a new employer unless the employee consents to do so. This right to choose, which is an inherent right granted to a person providing personal services pursuant to a contract, does involve a matter that goes to the very essence of the employment relationship. Therefore, we defer to the trial court's determination of this factual issue. *See Washington County Memorial Hosp.,* 7 S.W.3d at 546; *Luketich,* 835 S.W.2d at 507.

### Waiver

■■■■ FDC's final argument is that Dr. Roeder waived FDC's breach by remaining an employee and accepting substantial benefits of employment from July 2002 until March 2003. We disagree. The burden was on FDC to prove that Dr. Roeder waived FDC's breach of the employment contract. *See Forms Mfg., Inc. v. Edwards,* 705 S.W.2d 67, 70 (Mo.App. 1985). "Waiver is the intentional relinquishment of a known right. If waiver is implied from conduct, the conduct must clearly and unequivocally show a purpose to relinquish the right." *O'Connell v. School Dist. of Springfield R–12,* 830 S.W.2d 410, 417 (Mo. banc 1992). Whether Dr. Roeder waived FDC's breach of contract was an issue of fact for the trial court to decide. *See Waldroup v. Dravenstott,* 972 S.W.2d 364, 369–70 (Mo.App. 1998). The trial court ruled this issue against FDC for the following reasons:

> The uncontested facts indicate that (a) as soon as plaintiff [Dr. Roeder] learned of the existence of the Joint Employment Agreement, he used due diligence to obtain a copy of the same, and (b) within 17 days after his counsel looked at a copy of the Agreement, a draft of the lawsuit was prepared and hand delivered to Mr. McCracken. The lawsuit contained a specific allegation that Ferrell–Duncan breached the Employment Contract by making plaintiff an employee of Cox, and assigning plaintiff's rights and obligations under that Contract to Cox. (*See Exhibit 64, at ¶ 17, Count II* ). Further, Mr. McCracken at this January meeting, asked that the filing of the lawsuit be delayed pending settlement negotiations. It was as soon as negotiations broke down that plaintiff promptly resigned, and the lawsuit was promptly filed. There was no waiver.

(Italics in original.) Each of these findings is supported by the evidence. Accordingly, we defer to the trial court's determination of this factual question. *See Kling v. Taylor–Morley, Inc.,* 929 S.W.2d 816, 820–21 (Mo.App.1996); *Orchard Container Corp. v. Orchard,* 601 S.W.2d 299, 304 (Mo.App.1980).

### IV. Decision

■■■■ Since FDC materially breached its contract of employment with Dr. Roeder by executing the Joint Employment Agreement—which occurred well before Dr. Roeder allegedly violated the covenant not to compete—FDC is not entitled to enforce the covenant against him. *See*

Washington County Memorial Hosp., 7 S.W.3d at 546; *Luketich,* 835 S.W.2d at 507. "A party to a contract cannot claim its benefits where he is the first to violate it." *Smith–Scharff Paper Co., Inc.,* 813 S.W.2d at 28. Therefore, the trial court's judgment is affirmed.

PARRISH, P.J., and BARNEY, J., concur.