HD SUPPLY FACILITIES MAINTENANCE, LTD., APPELLANT, *v*. LEIF BYMOEN, AN INDIVIDUAL; AND AZ PARTS-MASTER, INC., AN ARIZONA CORPORATION, RESPONDENTS.

No. 50989

June 11, 2009                                    210 P.3d 183

*Lewis & Roca, LLP*, and *Daniel F. Polsenberg*, Las Vegas; *Ford & Harrison, LLP*, and *Dinita L. James*, Phoenix, Arizona, for Appellant.

*Fennemore Craig, P.C.*, and *David W. Dachelet*, Las Vegas; *Quarles & Brady Streich Lang, LLP*, and *Eric B. Johnson*, Phoenix, Arizona, for Respondents.

## OPINION

By the Court, Parraguirre, J.:

The United States District Court for the District of Nevada has certified, under NRAP 5, three questions concerning "[w]hether the Nevada rule stated in *Traffic Control Servs. v. United Rentals*, 120 Nev. 168, 172, 87 P.3d 1054, 1057 (2004), that 'absent an agreement negotiated at arm's length, which explicitly permits assignment and which is supported by separate consideration, employee [noncompetition] covenants are not assignable,' applies when a successor corporation acquires a non-competition covenant[, or a covenant of nonsolicitation or confidentiality] as a result of a merger?" We answer these questions in the negative and clarify that *Traffic Control*'s rule of nonassignability does not apply when a successor corporation acquires restrictive employment covenants as the result of a merger.

### FACTS AND PROCEDURAL HISTORY

These certified questions arise from a federal district court action brought by appellant HD Supply Facilities Maintenance, Ltd. (HDS), to enforce restrictive covenants in an employment agreement against its former employee, respondent Leif Bymoen, and respondent AZ Partsmaster, Inc. (AZP), Bymoen's current employer.

HDS is the product of two separate mergers. In the first merger, Bymoen's original employer, Century Maintenance Supply, Inc., was acquired by Hughes Supply, Inc. In the second, Hughes merged

with a subsidiary of The Home Depot, Inc. The surviving corporation—renamed HDS—emerged as one of the largest maintenance, repair, and operations supplies distribution firms in the United States. As Century's successor-in-interest, HDS claims to have succeeded to the restrictive covenants of former Century employees, including Bymoen's.

While at Century, Bymoen entered into covenants of nonsolicitation and confidentiality, as well as a noncompetition covenant restricting him for six months after his termination from "engag[ing] in any business activity, directly or indirectly, whether for profit or otherwise, which is similar to or competitive with the business of Century in any market area then being served by Century." The agreement did not contain an assignment clause.

Over the course of the two mergers and eventual name change, Bymoen continued in his position as a sales representative with Century's successors. On September 22, 2006, however, Bymoen voluntarily resigned from HDS and immediately took a sales position with AZP, an HDS competitor. Within days of joining AZP, Bymoen sent solicitation letters to his former HDS clients.

Learning of Bymoen's actions, HDS alerted AZP that Bymoen was allegedly in breach of the covenants contained in his original employment agreement with Century, HDS's predecessor. Nevertheless, AZP continued to employ Bymoen, prompting HDS to bring a federal action against both AZP and Bymoen for breach of contract, misappropriation of trade secrets, tortious interference with contractual relations, and breach of fiduciary duty.

Once suit was filed, Bymoen moved to dismiss HDS's contract claims on grounds that the restrictive covenants at issue were unenforceable under *Traffic Control* because he did not consent to their assignment when he was employed with Century. In response, HDS distinguished *Traffic Control* as limited to its facts, arguing first that the nonassignability rule announced in that decision was limited to asset purchase transactions, and second, that the rule did not govern the covenants of nonsolicitation and confidentiality.

Considering these conflicting arguments, the federal court concluded that *Traffic Control* was not clearly controlling precedent because it "d[id] not directly answer" the basic issue before it:

> whether a successor company may enforce an employee's noncompete, non-solicitation, and confidentiality covenants where the company claims the right to enforce the covenants through a . . . merger rather than through an asset purchase.

As a result, this issue was certified to this court under NRAP 5, in the form of three separate questions, which can be summarized as follows: whether the Nevada rule stated in *Traffic Control Services v. United Rentals*, 120 Nev. 168, 172, 87 P.3d 1054, 1057 (2004),

that "absent an agreement negotiated at arm's length, which explicitly permits assignment and which is supported by separate consideration, employee noncompetition covenants are not assignable," applies when a successor corporation acquires (1) a noncompetition covenant, (2) a nonsolicitation covenant, or (3) a confidentiality covenant as the result of a merger?

## DISCUSSION

These three certified questions ask us to clarify whether *Traffic Control*'s rule of nonassignability applies when a successor corporation acquires covenants of noncompetition, nonsolicitation, or confidentiality as the result of a merger. Because we conclude that *Traffic Control* does not apply in the context of a statutory merger, we answer these questions in the negative.

### *Traffic Control's rule of nonassignability*

In *Traffic Control*, this court addressed "whether an employer in a corporate sale may assign rights under an employee's covenant not to compete without the employee's consent." 120 Nev. at 169, 87 P.3d at 1055. Confronting an apparent split of authority, the court resolved the issue in the negative and announced that "absent an agreement negotiated at arm's length, which explicitly permits assignment and which is supported by separate consideration, employee noncompetition covenants are not assignable." *Id.* at 172, 87 P.3d at 1057.

Notwithstanding this broad language, which in Bymoen's view suggests that *Traffic Control* has a wider application, HDS argues that *Traffic Control* is narrowly limited to its facts, and as such, its rule prohibiting assignments does not apply when a successor corporation acquires restrictive employment covenants as the result of a merger. For the following two reasons, we agree.

#### *Traffic Control is a narrow decision based on the law of contract*

HDS asserts that *Traffic Control*'s nonassignability rule is grounded in the common law of contractual assignments and, therefore, does not control whether a restrictive covenant may be validly acquired in the context of a statutory merger. In view of *Traffic Control*'s discrete facts and narrow reasoning, we agree.

Rather than support a comprehensive inquiry into different types of corporate transactions and their various consequences for assignments, *Traffic Control*'s narrow set of facts—which involved the attempted assignment by a selling company of a noncompetition covenant under an asset purchase agreement—supported a much more limited inquiry, namely, whether the noncompetition covenant

passed to the acquiring company under an asset purchase agreement without the employee's consent. *Id.* at 169-71, 87 P.3d at 1055-56.

Nevertheless, despite the narrow facts before it, the court framed its inquiry somewhat generically as whether a noncompetition covenant was assignable in a "corporate sale," *id.* at 169, 87 P.3d at 1055, and, even more expansively, as whether the covenant was assignable "through the medium of an asset sale (*or otherwise*)." *Id.* at 172, 87 P.3d at 1057 (emphasis added). However, by seeming to treat an asset purchase as indistinguishable from other corporate transactions, the court's inquiry in *Traffic Control* was framed as if its restrictive rule would apply in any transactional context, which is the principal source of confusion underlying these certified questions.

As a result, we have been asked to determine the significance of this apparent incongruity—*i.e.*, whether, despite its broadly framed inquiry, *Traffic Control* is nonetheless limited to asset purchase transactions. In this regard, we agree with HDS that the limited scope of *Traffic Control*'s rule of nonassignability is betrayed by the nature of the court's reasoning and the narrowness of its concerns.

In *Traffic Control*, the court reasoned that because the covenants are "personal" in nature[1] and replacing a former employer with another obligee could fundamentally change the nature of an employee's obligation, noncompetition covenants could not be assigned without employee consent. *Id.* at 174-75, 87 P.3d at 1058-59.

Notably, by conditioning assignability on consent, *Traffic Control* protects against unbargained-for changes in the scope of the restraint barring a covenanting employee from competing with his or her former employer. *See id.* at 174, 87 P.3d at 1058. In this way, the rule of *Traffic Control* echoes the basic policy in the law of contractual assignments of honoring an obligor's choice to contract with only the original obligee, thereby ensuring that the obligor is not compelled to perform more than his or her original obligation. *See Munchak Corporation v. Cunningham*, 457 F.2d 721, 725-26 (4th Cir. 1972); *Roeder v. Ferrell-Duncan Clinic, Inc.*, 155 S.W.3d 76, 89 (Mo. Ct. App. 2004).

Carrying this policy further, beyond requiring employee consent as a general matter, *Traffic Control* imposes two additional condi-

---

[1]These covenants are considered "personal" to the employee since deciding whether to refrain from competition with an employer after termination is based on an individualized assessment of that particular employer's "character and personality." *Traffic Control*, 120 Nev. at 174, 87 P.3d at 1058.

tions to a valid assignment: an express assignability clause negotiated at arm's length and separate consideration. *Id.* at 175, 87 P.3d at 1059. As the court explained, the intended purpose of these conditions is to "place[ ] the burden on the employer to seek assignability and adequately compensate[ ] the party with the lesser bargaining power for the possibility that a stranger to the covenant may ultimately assume the right to its enforcement." *Id.*

Given this reasoning, which reveals a single-minded concern with preserving an employee's individualized choice to covenant not to compete with a particular employer, we conclude that *Traffic Control*'s rule of nonassignability stands for the general proposition, grounded in the law of contractual assignments, that personal services contracts are not assignable absent consent. *See* Restatement (Second) of Contracts § 317 (1981); 29 Richard A. Lord, *Williston on Contracts* § 74:10 (4th ed. 2003); 6 Am. Jur. 2d *Assignments* § 15 (2008); 6A C.J.S. *Assignments* § 32 (2004); *see, e.g.*, *Sisco v. Empiregas, Inc. of Belle Mina*, 237 So. 2d 463, 466-67 (Ala. 1970); *SDL Enterprises, Inc. v. DeReamer*, 683 N.E.2d 1347, 1349-50 (Ind. Ct. App. 1997); *Clark v. Shelton*, 584 P.2d 875, 877 (Utah 1978). As a protection under the law of contract, the rule therefore logically applies in the contractual setting of an asset purchase transaction because, in an asset purchase, "the transaction introduces into the equation an entirely different entity, the acquiring business." *Corporate Exp. Office Products v. Phillips*, 847 So. 2d 406, 412 (Fla. 2003).

However, despite the rule's natural affinity to asset purchases, Bymoen contends that *Traffic Control*'s prohibition on assignments without consent can be generalized to other forms of corporate transactions, including mergers. As discussed below, we disagree.

### Asset purchases are distinct from mergers

Although the court in *Traffic Control* lacked a similar opportunity, the Florida Supreme Court in *Corporate Express Office Products v. Phillips* addressed whether different forms of corporate transactions affect whether consent is necessary to effect a valid assignment of a covenant not to compete. 847 So. 2d 406.

Notably, while *Corporate Express* was cited in *Traffic Control* as authority for requiring consent to assignability in the context of an asset purchase, 120 Nev. at 174 n.10, 87 P.3d at 1058 n.10, as the certifying court expressed in its order denying Bymoen's and AZP's motion to dismiss HDS's contract claims, the citation of *Corporate Express* in *Traffic Control* is "ambiguous" because it was unclear whether we would adopt the remainder of the Florida Supreme

Court's reasoning regarding mergers. For purposes of these certified questions, we consider *Corporate Express*'s reasoning regarding mergers to be persuasive.

In *Corporate Express*, a corporation sued three former employees to enforce noncompetition covenants that purportedly passed to it from two of its predecessors, one of which the corporation claimed to have acquired through a 100-percent stock purchase and a subsequent merger, and the other via an asset purchase and a subsequent merger. 847 So. 2d at 407-08. Thus, unlike in *Traffic Control*, with three types of transactions before it—an asset purchase, a 100-percent stock purchase, and mergers—the court in *Corporate Express* was able to squarely address "whether the nature of the . . . transaction affects whether . . . consent to an assignment of a noncompete agreement is necessary." *Id.* at 409.

In answering affirmatively, the court sharply distinguished between the nature of an asset purchase and a merger. Unlike in a merger, in which "two corporations . . . unite into a single corporate existence," the acquiring corporation in an asset purchase becomes, in effect, a wholly new employer. *Id.* at 412-14. Accordingly, based on its recognition of a merging corporation's shared existence with its successor, the court concluded that, under Florida's merger statute, "the surviving corporation in a merger assumes the right to enforce a noncompete agreement entered into with an employee of the merg[ing] corporation by operation of law, and no assignment is necessary." *Id.* at 414.

Although under a slightly varied rationale, these sharp distinctions were recently reiterated in *Aon Consulting v. Midlands Financial*, 748 N.W.2d 626 (Neb. 2008). There, the Nebraska Supreme Court considered whether a successor corporation could enforce a former employee's nonsolicitation covenant under Maryland's merger statute, which controlled under the merger agreement. *Id.* at 636. However, even though the Maryland and Florida statutes were based on similar language, *compare* Md. Code Ann., Corps. & Ass'ns § 3-114 (LexisNexis 2008) *with* Fla. Stat. Ann. § 607.1106 (West 2007), instead of embracing *Corporate Express*'s "corporate continuity" rationale, the court in *Aon Consulting* concluded simply that a nonsolicitation covenant is a corporate asset, and as such "passes by operation of law to a successor corporation as the result of a merger, regardless of whether the agreement would otherwise be assignable." 748 N.W.2d at 637.

Notably, despite some superficial differences in their rationales, *Corporate Express* and *Aon Consulting* looked directly to the relevant merger statute—as opposed to contract principles—to resolve whether a restrictive covenant transferred to a successor cor-

poration following a merger. Indeed, when a relevant merger statute exists, the issue of a covenant's assignability is not controversial. *See* 19 C.J.S. *Corporations* § 909 (2008). As the majority of courts have concluded when considering this issue, in a merger, the right to enforce the restrictive covenants of a merged corporation normally vests in the surviving entity.[2] *See, e.g., UARCO Inc. v. Lam*, 18 F. Supp. 2d 1116, 1122 (D. Haw. 1998); *Corporate Express*, 847 So. 2d at 414; *Alexander & Alexander, Inc. v. Koelz*, 722 S.W.2d 311, 313 (Mo. Ct. App. 1986); *Aon Consulting*, 748 N.W.2d at 637; *Farm Credit Services v. Wysocki*, 627 N.W.2d 444, 450-53 (Wis. 2001).

While this particular issue has never been directly confronted in Nevada, historically, this court has recognized a hard-and-fast distinction between the implications of a merger, which is a statutory creature, and an asset purchase, which is not. Specifically, in *Lamb v. Leroy Corp.*, a case involving whether an acquiring corporation was liable for a selling corporation's debts, the court contrasted an asset purchase, in which an acquirer does not assume the liabilities of the seller, with a merger, which "imposes upon the surviving corporation all liabilities of the constituent corporations so merged."[3] 85 Nev. 276, 279, 454 P.2d 24, 26 (1969). Thus, in light of *Corporate Express* and *Aon*, which treat mergers as distinct from asset purchases, and *Lamb*, which confirms that this basic distinction exists in Nevada, we clarify that *Traffic Control*'s rule of nonassignability does not apply when a successor corporation acquires restrictive employment covenants as the result of a merger.[4]

---

[2]This interpretation finds further support in the official comment to section 11.07 of the Model Business Corporation Act, which provides that "all property owned by, and every contract right possessed by, each corporation . . . that merges into the survivor is vested in the survivor without reservation or impairment." 3 Model Bus. Corp. Act Ann. § 11.07 cmt. (2008). In explaining the effect of a merger under this model provision, the comment clarifies that a merger does "not give rise to a claim that a contract with a party to the merger is no longer in effect on the ground of nonassignability, unless the contract specifically provides that it does not survive a merger." *Id.* This is so, according to the drafters, because "[a] merger is not a conveyance, transfer, or assignment," but rather a unique process of combining corporate entities. *Id.*

[3]Although *Lamb* was construing former NRS 78.495, which provided that in the event of a merger the "surviving corporation . . . shall possess all the rights, privileges, powers and franchises . . . and be subject to all the restrictions, disabilities and duties of each of the constituent corporations so merged," this early statute differs little in regard to the succession of rights of a surviving entity set forth in NRS 92A.250, Nevada's modern merger statute.

[4]Nevertheless, Bymoen urges this court to follow the reasoning of *Smith, Bell & Hauk, Inc. v. Cullins*, 183 A.2d 528 (Vt. 1962), in which the Vermont

*Covenants of nonsolicitation and confidentiality*

Since we have clarified that *Traffic Control*'s rule of nonassignability does not apply to statutory mergers, we need not address whether our conclusion would change depending on the type of covenant—whether one of noncompetition, nonsolicitation, or confidentiality—that a successor corporation stands to inherit in this type of corporate transaction.

## CONCLUSION

The rule of nonassignability adopted in *Traffic Control* does not apply when a successor corporation acquires restrictive employment covenants as the result of a merger. Accordingly, we answer the three certified questions in the negative.

HARDESTY, C.J., DOUGLAS, CHERRY, SAITTA, and GIBBONS, JJ., concur.

PICKERING, J., concurring:

I concur in the majority's decision to limit *Traffic Control Services v. United Rentals*, 120 Nev. 168, 87 P.3d 1054 (2004), to the asset sale setting, despite the range of its dicta. I write separately to emphasize NRS 613.200(4), which *Traffic Control* mentions only briefly, and the majority's opinion does not cite. This statute sets controlling Nevada public policy. It provides that restrictive covenants in Nevada employment agreements are enforceable so long as "the agreement is supported by valuable consideration and is otherwise reasonable in its scope and duration." NRS 613.200(4). But for the stare decisis respect due *Traffic Control*, in my estimation judicial analysis of the enforceability of restrictive covenants in the merger and acquisition setting should begin and end with NRS 613.200(4).[1] In other respects, such covenants should be judged by the same rules as apply to contracts generally.

Supreme Court concluded that an acquiring corporation in a stock purchase transaction could not enforce a former employee's noncompetition covenant under Vermont's now-superseded merger statute, which provided that upon an asset sale, merger, or consolidation of different corporate entities, the acquiring corporation "shall possess all the rights, privileges and benefits of the original corporation *properly exercisable* under the laws of [Vermont]." *Id.* at 531 (emphasis added) (citing Vt. Stat. Ann. tit. 11, §§ 161, 165 (1958)). However, *Cullins* is unpersuasive because the court read the phrase "properly exercisable" as subjecting the noncompete agreement at issue in that case to the common law rule of nonassignability that we recognized in *Traffic Control*. Thus, while *Cullins* may remain good law with respect to asset purchase transactions, we are not persuaded that it has any application to mergers.

[1]The 1995 Legislature added paragraph 4 to NRS 613.200 "to make it clear that the statute of Nevada does not prevent th[e]se kind of reasonable contracts from existing." Hearing on S.B. 128 Before the Senate Comm. on Commerce

As the federal district court's certification order reflects, *Traffic Control* can fairly be read to apply to all changes in an employer's ownership, whether accomplished by asset sale, dissolution, merger, or stock sale. Thus, *Traffic Control* frames the question presented as "whether noncompetition covenants may be assigned from one employer to another through the medium of an asset sale (*or otherwise*)." 120 Nev. at 172, 87 P.3d at 1057 (emphasis added). It answers the question in equally broad terms: "Covenants not to compete are personal in nature and therefore are not assignable absent the employee's express consent. Further, an employer must obtain such consent through arm's-length negotiation with the employee, supported by valuable consideration beyond that necessary to support the underlying covenant." *Id.* at 176, 87 P.3d at 1060.

Whether an employer's business is transferred by asset sale, as opposed to merger or stock sale, should make little difference to an affected employee, if that information is even known. Nonetheless, to explain its narrow reading of *Traffic Control*, the majority distinguishes between asset sales and other forms of corporate acquisition, finding no "assignment" in rights that succeed by merger as distinguished from asset sale. While I agree with the majority, what I respectfully submit is missing from its analysis are the policy reasons for disavowing *Traffic Control*'s dicta.

There are a number of reasons to limit *Traffic Control* to its stated facts. First, its "personal services" rationale is questionable, given that "the 'personal' nature of an employment contract ends following termination" and has little application to modern employment relationships. *Sogeti USA LLC v. Scariano*, 606 F. Supp. 2d 1080, 1084, 1086 (D. Ariz. 2009) (criticizing *Traffic Control* and predicting the Arizona Supreme Court would reject its holding); *see AutoMed Technologies, Inc. v. Eller*, 160 F. Supp. 2d 915, 924 (N.D. Ill. 2001) (noting that, while "[a]n employee has a clear interest in controlling for whom he works . . . the identity of the party enforcing a restrictive covenant should make little difference to a former employee" challenging a restrictive covenant).

Second, the criteria set out in NRS 613.200(4) and in similar law elsewhere for determining the enforceability of restrictive covenants are better suited to the job of assessing the fairness of enforcing re-

and Labor, 68th Leg. (Nev., Feb. 24, 1995) (comments of Senator Raggio). Reportedly, the Legislature was concerned that if Nevada did not permit such contracts to protect trade secrets and clients, businesses would choose not to operate in this state. *Id.* The Legislature considered whether the statutory limitations afforded employees sufficient protection and concluded that they did. "These kinds of contracts have to have valuable consideration. These types of covenants are enforceable; they do not involve involuntary servitude if they are supported by valuable consideration, if they impose no greater restraint on the employee than necessary to protect the business and goodwill of the person." *Id.*

strictive covenants than corporate law distinctions between mergers, stock acquisitions, and asset sales. *See Sogeti*, 606 F. Supp. 2d at 1085. These criteria focus on the employment relationship itself, not the transactional or corporate means by which a change in the parties to that relationship occurs: Did the change in employer, however accomplished, materially change the scope of the restrictive covenant for which consideration was given, making its enforcement unreasonable? This is the right question to ask, regardless of how the successor came to stand in the original employer's shoes. Nonetheless, under *Traffic Control* as narrowed by the majority's opinion, in an asset sale setting, pre-acquisition restrictive covenants are not enforceable without new consideration and employee consent (unless the preexisting contract specifies free assignability), whereas in the merger or stock acquisition setting, they are. And this is true whether the new employer is a whale devouring a minnow or a retiring parent transferring a small business to a daughter or son, and without regard to the consideration given for the original covenant.

Third, contract law normally allows assignment of contract rights unless assignment is prohibited by express contract term, statute, or public policy, or the particular circumstances of the case are such that allowing substitution materially varies the burden or risk of performance. Restatement (Second) of Contracts § 317 (1981). *Traffic Control*'s "holding that restrictive covenants may never be assigned without consent" thus reverses the normal common law rule allowing assignment and imposes "new public policy restrictions on contract rights." *See AutoMed*, 160 F. Supp. 2d at 924, *cited with approval in Sogeti*, 606 F. Supp. 2d at 1086. In the 1995 amendments to NRS 613.210(4), the Legislature set public policy to govern creation and enforcement of restrictive covenants in contracts that apply to Nevada businesses with Nevada employees. This is a valid exercise of legislative prerogative. *Cf. Edwards v. Arthur Andersen LLP*, 189 P.3d 285, 292-93 (Cal. 2008) (rejecting a Ninth Circuit decision suggesting California courts would judicially adopt a "narrow-restraint" exception to California statute that, unlike Nevada's, invalidates restrictive covenants unless a specific statutory exception applies; and noting that it would "leave it to the Legislature, if it chooses, either to relax the statutory restrictions or adopt additional exceptions to the prohibition-against-restraint [statutory] rule"). By imposing additional requirements, beyond those stated in the statute, *Traffic Control* unsettles normal contract-law-based expectations that the Legislature intended to foster.

Finally, as the employer conceded at argument, avoiding invalidation under *Traffic Control*'s per se rule is only a first step; the court will still have to assess whether the contract, viewed in light of the new, post-merger day, satisfies NRS 613.200(4). Today's case apparently does not present conflicts between Nevada and other

states' laws. But as the Vermont law analyzed by the majority, *ante* n.4, suggests, we can expect that issue to visit next. The question becomes whether the multilayered analysis our decisional law now requires adds anything beyond complexity and delay to fair and efficient dispute resolution in this arena. I submit that it does not.